## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS, BOSTON

| | |
|---|---|
| _____ ) | |
| **TIMOTHY P. MOONEY & SUSAN** ) | |
| **MOONEY, KIM CHOUNSVATHMAO,** ) | |
| **JAMES &TAMMY COLBERT, MARY** ) | **C.A. NO.** |
| **KYENG KAO & SOMNANG EL,** ) | |
| **RUSSELL B. LITTLE, EFRAIN** ) | **CLASS ACTION COMPLAINT** |
| **CARTAGENA, ELIZABETH** ) | |
| **ALVAREZ, THOMAS M. KEARNEY,** ) | **JURY TRIAL DEMANDED** |
| **SCOTT A. WEBSTER, and JOSEPH M.** ) | |
| **O'BRIEN, on behalf of themselves** ) | |
| **and all others similarly situated** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| *v.* ) | |
| ) | |
| **WELLS FARGO BANK, N.A. d.b.a.** ) | |
| **WELLS FARGO HOME MORTGAGE** ) | |
| **& AMERICA'S SERVICING COMPANY,** ) | |
| **BAC HOME LOANS SERVICING, LP,** ) | |
| **BANK OF AMERICA, N.A.,** ) | |
| **FEDERAL HOME LOAN** ) | |
| **MORTGAGE CORPORATION, FEDERAL** ) | |
| **NATIONAL MORTGAGE ASSOCIATION,** ) | |
| **URBAN LENDING SOLUTIONS,** ) | |
| **GMAC MORTGAGE, LLC,** ) | |
| **CITIMORTGAGE, INC., VERICREST** ) | |
| **FINANCIAL, INC,** ) | |
| **OCWEN LOAN SERVICING, LLC,** ) | |
| **AMERICAN HOME MORTGAGE** ) | |
| **SERVICING, INC.,** ) | |
| **DEUTSCHE BANK NATIONAL TRUST** ) | |
| **COMPANY, BANK OF NEW YORK** ) | |
| **MELLON, U.S. BANK, N.A.** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**TABLE OF CONTENTS**

I. INTRODUCTION ...........................................................................…………4

II. JURISDICTION AND VENUE ...................................................…..….5

III. PARTIES ...............................................................................……....5

IV. SEVICER DEFENDANTS...............................................……………..…..9

    A. Facts............................……………………………………….,.…9

        i.) General Background…………………………………………….,…9

        ii.) Government Assistance - Background……………………………11

        iii.) Fraudulent Scheme of Servicer Defendants…………………………12

        iv.) Urban & Bank of America's Fraudulent Scheme…………………….……16

        v.) Servicers' Financial Incentives Against Modification…………….……...20

    B. Named Plaintiffs' Facts & Allegations.......................................…..23

    C. Class Allegations  …………………………………………………48

    D. Causes of Action …………………………………………..….54

        Count I - Fraud ……………………………………….…..54

        Count II - Negligence  ……………………………….…..57

V. TRUSTEE DEFENDANTS.......................................………....….......60

    A. Facts  ......................……………………………….…60

        i.) General Background……………………………..…60

        ii.) Contractual Obligations among Parties in a Mortgage Securitization ………..61

        iii.) Federal National Mortgage Association - Facts……………………65

        iv.) Federal Home Loan Mortgage Corporation - Facts…………….……68

        v.) Servicer Involvement in Foreclosure Process Completes Their Fraud ………..71

        vi.) Summary…………………………………………..…73

    B. Named Plaintiffs' Facts & Allegations …………………………...75

    C. Class Allegations …………………………………………..102

    D. Causes of Action …………………………………………..107

Count III - Violation of Mass. Uniform Comm. Code § 3-60 & 3-603  ………..107

Count IV - Negligence  ………………………………………………………108

PRAYER FOR RELIEF……………….......…...................................................…..111

## I.    **INTRODUCTION**

1.      Plaintiffs Timothy P. Mooney & Susan Mooney, Kim Chounsvathmao, Tammy

Colbert, and Mary Kyeng Kao (a.k.a. Kyeng Kao) & Somnang El, Russell B. Little, Efrain

Cartagena, Elizabeth Alvarez, Thomas M. Kearney, Scott A. Webster, and Joseph M.

O'Brien, on behalf of themselves and all other similarly-situated individuals ("Plaintiffs")

bring this class action as described in the paragraphs set forth herein.

2.      This complaint arises from the acts and/or intentional omissions of the Defendants,

acting independently and through their subsidiaries, owners and/or predecessors in interest  as

follows;

      a.    Wells Fargo Bank, N. A. d.b.a. Wells Fargo Home Mortgage & Americas

Servicing Company (collectively referred to as "Wells Fargo" where not otherwise

described in their individual capacities), Bank of America, N.A. & BAC Home Loans

Servicing, LP (collectively referred to as "BOA" where not otherwise described in

their individual capacities), Urban Lending Solutions, GMAC Mortgage, LLC,

Citimortgage, Inc., Vericrest Financial, Inc., Ocwen Loan Servicing, LLC, and

American Home Mortgage Servicing, Inc. (all collectively referred to as "Servicer

Defendants");

      b.    Federal Home Loan Mortgage Corporation, a.k.a. FHLMC and/or Freddie Mac, in

its capacity as Trustee for various, as yet identified FHLMC Trusts, Federal National

Mortgage Association, a.k.a. FNMA and/or Fannie Mae, in its capacity as Trustee for

various, as yet identified FNMA Trusts, Deutsche Bank National Trust Company,

Bank of New York Mellon, U.S. Bank, N.A., and Wells Fargo Bank, N.A.

(collectively referred to as "Trustee Defendants")

as a result of:

      a.    the Servicer Defendants; fraudulently hindering the mortgage loan modification

process, deceptively and unfairly misleading borrowers through offers of mortgage

modification assistance to borrowers, negligence in duty of care to borrowers during

their administration of modification review business practices, all as part of an overall fraudulent scheme to  maximize mortgage servicing profitability;

b.    the Trustee Defendants and Servicer Defendants; by attempting foreclosure and/or foreclosing Deeds of Trust when no actual default existed to the Holder of the Notes associated with those Deeds of Trust, in violation of law, and negligence in duty of care when conducting the foreclosure process.

## II.    JURISDICTION AND VENUE

3.        This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that this complaint is a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are 100 or more members in the proposed class and the Named Plaintiffs are citizens of a State different from the majority of Defendants.

4.        The parties are joined in a single lawsuit due to the significant number of common issues of fact and law raised by the claims of the Plaintiffs as detailed below.

5.        Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because Plaintiffs are residents of Massachusetts and Defendants transact substantial business in this district.

## III.    PARTIES

6.        Individual and Representative Plaintiff Timothy P. Mooney is a citizen of Massachusetts residing at, and claims to be one of the rightful owners of 43 South Street, Kingston, MA 02364 which is one of the subject properties referenced herein.

7.        Individual and Representative Plaintiff Susan Mooney is a citizen of Massachusetts residing at, and claims to be one of the rightful owners of 43 South Street, Kingston, MA 02364 which is one of the subject properties referenced herein.

8.        Individual and Representative Plaintiff Kim Chounsvathmao is a citizen of Massachusetts residing at, and claims to be the rightful owner of 9 Rockland Street, Lynn, MA 01902 which is the subject property referenced herein.

9.      Individual and Representative Plaintiffs  James & Tammy Colbert are citizens of the State of Massachusetts residing at and claim to be the rightful owners of 8 Evergreen Street, Plainville, MA 02762, which is one of the subject properties incorporated and referred to herein.

10.     Individual and Representative Plaintiffs Mary Kyeng Kao (a.k.a. Kyeng Kao) and Somnang El are citizens of the State of Massachusetts residing at and the rightful owners of 11 Brickett Street, Lowell, MA 01851, which is one of the subject properties incorporated and referred to herein.

11.     Individual and Representative Plaintiff Russell B. Little is a citizen of Massachusetts residing at, and claims to be the rightful owner of 52 Sunset Boulevard, East Wareham, MA 02538 which is one of the subject properties referenced herein.

12.     Individual and Representative Plaintiff Efrain Cartagena is a citizen of Massachusetts residing at 473 Chestnut Hill Road, Millville, MA 01529 and claims to be one of the rightful owners of 161 Beaver Street, Framingham, MA 01702 which is one of the subject properties referenced herein.

13.     Individual and Representative Plaintiff Elizabeth Alvarez is a citizen of Massachusetts residing at 473 Chestnut Hill Road, Millville, MA 01529 and claims to be one of the rightful owners of 161 Beaver Street, Framingham, MA 01702 which is one of the subject properties referenced herein.

14.     Individual and Representative Plaintiff Thomas M. Kearney is a citizen of Massachusetts residing at, and claims to be the rightful owner of 39 Forest Street, Sherborn, MA 01770 which is one of the subject properties referenced herein.

15.     Individual and Representative Plaintiff Scott A. Webster is a citizen of Massachusetts residing at, and claims to be the rightful owner of 43 Hutchings Street, Boston, MA 02121 which is one of the subject properties referenced herein.

16.     Individual and Representative Plaintiff Joseph M. O'Brien is a citizen of Massachusetts residing at, and claims to be the rightful owner of 251 Theresa Road, Bellingham, MA 02019.

17.     Defendant Wells Fargo Bank, N.A., d.b.a., Wells Fargo Home Mortgage & Americas Servicing Company (ASC), are banking and mortgage servicing companies which upon information and belief has headquarters located at 420 Montgomery Street, San Francisco, CA 94104.

18.     Defendant Bank of America, N.A. is a national bank and financial services corporation with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255.

19.     Defendant BAC Home Loans Servicing, LP is a residential mortgage servicing company and a wholly owned subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302.

20.     Defendant Federal Home Loan Mortgage Corporation (FHLMC) is located at 325 Seventh Street, Washington, DC 20002.  Upon information and belief FHLMC was and/or is trustee, guarantor, and/or investor for an as yet accurately identified securitized mortgage backed Trust which owns Plaintiffs' Note and Mortgage.

21.     Defendant Federal National Mortgage Association is located at 3900 Wisconsin Avenue, NW, Washington, DC 20016.  Upon information and belief FNMA was and/or is trustee, guarantor, and/or investor for an unknown number of securitized mortgage backed Trusts which owned Plaintiff's Notes and Deeds of Trust.

22.     Defendant Urban Lending Solutions (formerly Urban Settlement Services, LLC) is a private company providing outsource mortgage industry related support services. Upon information and belief Urban Lending Solutions is located at 1001 Liberty Avenue Pittsburgh, PA 15222.

23.     Defendant GMAC Mortgage, LLC is a residential mortgage servicing company who, upon information and belief is located at 1100 Virginia Drive, Fort Washington, PA 19034.

24.     Defendant CitiMortgage, Inc. is owned by Citigroup, Inc. a New York corporation. Upon information and belief Defendant CitiMortgage, Inc. is headquartered at 1000 Technology Drive, O'Fallon, Missouri, 63368.

25.     Defendant Vericrest Financial, Inc. is a residential mortgage servicing company who, upon information and belief is located at 13801 Wireless Way, Oklahoma City, OK 73134.

26.     Defendant Ocwen Loan Servicing, LLC, is a mortgage servicing company which upon information and belief has headquarters located at 1661 Worthington Road, West Palm Beach, FL 33409.

27.     Defendant American Home Mortgage Servicing, Inc., is a mortgage servicing company which upon information and belief has headquarters located at 1525 South Beltline Road, Coppell, TX 75019.

28.     Defendant, Deutsche Bank National Trust Company ("Deutsche Bank") is located at 7575 Irvine Center Drive, Irvine, CA 92618.  Deutsche Bank is the Trustee for the certificate holders of various Trusts as noted herein.

29.     Defendant Bank of New York Mellon is a company which was nominated as, and remains currently as Trustee for the various mortgage backed Trusts as referenced herein. Upon information and belief Defendant Bank of New York Mellon is located at 1 Wall Street, New York, NY 10005.

30.     Defendant US Bank N. A. is a company which was nominated as, and remains currently as Trustee for the various mortgage backed Trusts as referenced herein. Upon information and belief Defendant US Bank N. A. is located at 425 Walnut Street, Floor 1, Cincinnati, OH 45202.

31.     In 2007, Defendant Bank of America commenced negotiations to acquire Countrywide Home Loans, Inc. and Countrywide Financial Corporation (hereinafter referred to as "Countrywide").  By late 2007, Bank of America began merging its operations with Countrywide and adopting some of Countrywide's practices.  From and after its acquisition of

8

Countrywide in July 2008 and continuing to the present, both as a successor in interest to Countrywide and as a principal, Bank of America has engaged in and continued the wrongful conduct complained of herein.

## IV.   SERVICER DEFENDANTS

### A.   FACTS

#### i.)   General Background

32.    The residential mortgage servicing industry was created decades ago when mortgage lenders designed a standardized system by which they could securitize mortgages and thereby recapitalize their lending capability, after having lent out the majority of their capital, much faster than waiting years for borrowers to pay off their mortgages. The premise was simple enough; a mortgage originator makes a large number of loans. That originator pools the loans into one large grouping known as a "pool of mortgages". That pool of mortgages is then sold to a Real Estate Mortgage Investment Conduit (REMIC). These REMICs are often named and referred to as Trusts. They are legal entities registered with the Securities and Exchange Commission. However, they are merely "shells" created for the sole purpose of acquiring the pools of mortgages, which become assets of the respective Trusts.

33.    The creation of this "mortgaged backed Trust" concept allows mortgage originators to get the loans it recently made off their books. They no longer have ownership of the mortgages and notes they pooled together and consequently become recapitalized, giving originators the ability to lend again, in months as opposed to years. Originators also obtain the added benefit that should mortgages default and eventually fail, they suffer no financial consequences as they no longer retain any ownership interest in those mortgages and notes that have been pooled and sold to Trusts.

34.    Trusts are inherently faced with two problems from the moment of their creations. First, because they are just "shells" (they have no physical address, no communications capability, and no personnel), they have no capital to pay for the pools of mortgages, and

secondly, for the same reason as aforementioned, they have no personnel to service the mortgage accounts.

35.     The first problem is solved by the securitization of the Trust's assets. This is done by selling bonds (sometimes referred to as certificates) commonly called Residential Mortgage Backed Securities (RMBS) or simply Mortgage Backed Securities (MBS) to big investors such as pension funds, retirement funds, etc.

36.     The second problem is solved by paying companies (i.e. the Servicer Defendants) to deal with the day to day handling of mortgage servicing related matters such as collecting monthly principal and interest payments, paying taxes and insurance, etc.  Thus the necessity of keeping the Trusts as separate entities, in order for the recapitalization of mortgage originators to be accomplished through securitization, gave rise to the mortgage servicing industry.

37.     When a securitization of mortgages takes place many documents are created to outline the duties of the various participants of each securitization. These documents include required forms that must be filed with the SEC and those that are not. Those documents relevant to this complaint are the Prospectus and/or Prospectus Supplement, and the Pooling and Servicing Agreement.

38.     The Prospectus and/or Prospectus Supplement are documents, registered with the SEC, outlining the entire structure of a mortgage backed Trust's securitization. Their topics range from descriptions of the mortgages in the pool, who originated those mortgages and under what circumstances, who the Trustee of said Trust shall be and their duties, the delivery of the mortgages and notes to the Trust, The Certificates (bonds) offered for sale, monthly payments to the Certificate holders (bond holders), and who the servicer will be at the inception of the Trust as well as the servicer's duties. The Prospectus and/or Prospectus Supplement is the document given to potential purchasers of the MBSs being offered for sale by the Trust in much the same manner that a company going public issues a prospectus prior to the issuance of its stock on a public exchange.

39.     In a Prospectus and/or Prospectus Supplement another document is referenced called a Pooling and Servicing Agreement (PSA). The majority of the clauses contained in the PSA are contained in the Prospectus and/or Prospectus Supplement as the PSA is a contract between the Trust and the servicer and is not necessarily required to be registered with the SEC, so long as its relative content, as it relates to the financial impact it has on said Trust, is disclosed in full within the Prospectus and/or Prospectus Supplement.

40.     As stated in all Prospectus and/or Prospectus Supplements, mortgage servicers are paid by Trusts to service the Trust's mortgages, and part of payment for the performance of these services is based as a percentage of the total amount of principal balance of all the loans in a given pool of mortgages the servicer services (i.e. $1,000,000,000 in pool principal balance @ .5% = $5,000,000 servicing fee).

### ii.)     Government Assistance - Background

41.     When the Real Estate Market suffered a nationwide collapse in 2008, much of the focus of the government was to find a way to assist homeowners in danger of losing their homes.

42.     To that end, Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act").  12 U.S.C. § 5201 (*et seq.*) (2009).

43.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."

44.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.

45.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.

46.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities."  12 U.S.C. § 5213(3).

47.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."

48.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

49.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

50.     The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

51.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.  It is the exploitation of this subprogram that is an important component of the overall fraudulent scheme perpetrated on the named Plaintiffs herein and millions of others, by all Servicer Defendants named herein.

### iii.)     Fraudulent Scheme of Servicer Defendants

52.     On various dates in 2009, the Servicer Defendants each became a participating servicer of the United States Treasury Department's Making Home Affordable Program (of which HAMP is a subsidiary program) and the CEOs of each respective Servicer Defendant's

organization authorized the execution of a Servicer Participation Agreements (SPA) agreeing to follow the guidelines and supplemental directives of the aforementioned programs.

53.     When each Servicer Defendant signed a SPA with the U.S. Treasury, they agreed in their capacity as loan servicer to participate in HAMP, to abide by HAMP's requirements, and to perform loan modification and other foreclosure prevention services described in the program guidelines and supplemental directives.

54.     Once agreeing to participate in HAMP, each Servicer Defendant launched public awareness campaigns via various media to let Plaintiffs, and other borrowers of mortgage loans they serviced, know that assistance in modifying their mortgages was readily available to them.

55.     The Servicer Defendants' mailed scores of notices offering assistance to Plaintiffs and other borrowers, posted links on their web sites offering modification assistance, easy access to information regarding modification assistance, encouraged Plaintiffs and other borrowers in those notices and on those web sites, to apply for modification, and that their servicer wanted to help Plaintiffs and others.

56.     In these offers of assistance, the Servicer Defendants, made representations such as, but not limited to: a) that they offered modification programs, including the federal government's HAMP, b) that they "encouraged" borrowers to apply for a loan modification, c) that they wanted to "help" borrowers, and d) that they wanted to make borrowers mortgage payments "more affordable".

57.     Through their various offers of assistance and their agreeing to participate in the HAMP program, each Servicer Defendant represented to Plaintiffs they would properly review and respond in good faith to Plaintiffs' requests for modification assistance.

58.     Plaintiffs accepted and acted on these offers of assistance, by applying for modification of their mortgage loans, and further relied on representations that each Servicer Defendant would assist them, in good faith, by following HAMP Guidelines and Directives.

59.     However, when the HAMP Program was introduced, the CEOs of each Servicer Defendant and their senior management teams, recognized right away that HAMP and all manner of mortgage loan modification requests could become an integral part of an overall fraudulent scheme to unfairly earn billions of dollars in illicit profits from servicing defaulted mortgage loans by exploiting Plaintiffs and millions of other borrowers modification requests, by using those requests to keep millions of mortgages in a perpetual default status.

60.     The senior management teams of the Servicer Defendants designed those written offers of assistance, at the direction of and approval from the CEOs of each Servicer Defendant, which were mailed to Plaintiffs and millions of borrowers nationwide. These offers of assistance were intended to induce consumer reliance and encourage Plaintiffs and millions of other borrowers to apply for modification assistance based on the representation each Servicer Defendant was a participating servicer under HAMP, who had agreed to abide by its guidelines and directives and promote HAMP's mandate to assist borrowers in avoiding foreclosure of their homes, that each Servicer Defendant wanted to assist homeowners in maintaining homeownership, and that each Servicer Defendant would "help" Plaintiffs and other borrowers who applied for such assistance.

61.     However, these offers of assistance from each Servicer Defendant to Plaintiffs and millions of other borrowers were designed solely to induce consumer reliance of those Plaintiffs and other borrowers who received them. Each Servicer Defendant's true intent was to get as many Plaintiffs and other borrowers to apply for modification assistance and then purposefully hinder those modification requests, so as to leave them in abeyance, by design, in order to profit from the servicing of defaulted mortgage loans.

62.     The senior management teams and CEOs of each Servicer Defendant knew of the falsity of the misrepresentations made in those offers of assistance, knew those offers would induce consumer reliance, and knew that those homeowners applying for said modification assistance would be harmed by each Servicer Defendant's misrepresentations contained in those offers of assistance.

14

63.     Each Servicer Defendant subjected the applicant Plaintiffs and millions of other borrowers to a daunting challenge of misinformation, lost document claims, repetitive requests for documents already supplied, and all manner of tactics designed to purposefully stall or otherwise hinder the modification application process during futile attempts at modification, as a matter of policy, approved by the CEOs of each Servicer Defendant, using Plaintiffs and millions of other borrowers as unwitting pawns in their fraudulent scheme to profit from the servicing of defaulted mortgage loans.

64.     In facilitation of this fraudulent scheme, each CEO and the senior management teams of each Servicer Defendant approved, condoned and allowed to be executed corporate policies that allowed for their companies agents to; a) falsely deny receiving documents from Plaintiffs and others when applying for modification consideration, b) lie to Plaintiffs and others regarding their eligibility for modification, c) intentionally force Plaintiffs and others to wait months or years before determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests and risk of eligibility loss to Plaintiffs and others, e) purposefully fail to properly review Plaintiffs' and others requests for modification assistance, f) falsely deny eligibility when eligibility should have been granted, g) and purposefully allow Plaintiffs' and others modification documents to continually expire, requiring resubmission, in a deliberate effort to keep their mortgage loans in a near perpetual state of default all as part of a well organized fraudulent scheme to increase corporate profit through gains from the servicing of defaulted mortgage loans.

65.     This fraudulent scheme was accomplished by the combined exploitation of the HAMP Program, borrower modification requests in general, and manipulation of the Pooling and Servicing Agreements governing the contractual obligations of, and payment for services rendered to, each Servicer Defendant regarding the pools of mortgages they service for the Trusts that own said pools.

66.     Each Servicer Defendant purposefully hindered the modification process to keep Plaintiffs and other modification applicant borrowers in a near perpetual state of default, so as to exploit pools of mortgages for maximal profitability, keeping the total amount of principal balance of the pool artificially inflated thereby maximizing the amount of the servicing fees collected by the Servicer Defendants from servicing those defaulted mortgage loans.

67.     Were the Servicer Defendants to simply foreclose on all borrowers as soon as good servicing practices would dictate, the servicing fees they collect would drop as suddenly and dramatically as the principal balance of the mortgages in said pools. Instead they purposefully and willfully delay foreclosure, by manipulating and hindering Plaintiffs' and others attempts at modification, with no intent whatsoever of modifying those mortgages, so as to lower servicing income in a controlled manner and maximize profits from servicing income for as long a time as is possible. In doing, so each Servicer Defendant intentionally and knowingly prevented Plaintiffs and millions of other eligible borrowers the ability to access a government sponsored program specifically designed to assist homeowners and prevent unnecessary foreclosures.

           **iv.)     Urban Lending Solutions and Bank of America's Fraudulent Scheme**

68.     As noted above, when the HAMP Program was introduced, the CEOs of the Bank of America (BOA) Defendants and their senior management teams, also recognized right away that HAMP and all manner of mortgage loan modification requests could become an integral part of an overall fraudulent scheme to unfairly earn billions of dollars in illicit profits from servicing defaulted mortgage loans by exploiting Plaintiffs and other borrowers modification requests, by using them to keep millions of mortgages in a perpetual default status.

69.     The senior management teams of BOA designed written offers of assistance, at the direction of and approval from CEO, Brian Moynihan, which were mailed to millions of borrowers nationwide. These offers of assistance were intended to induce consumer reliance and encourage Plaintiffs and millions of other borrowers to apply for modification assistance based on the representation BOA was a participating servicer under HAMP, and had agreed to

abide by HAMP guidelines and directives and promote HAMP's mandate to assist borrowers in avoiding foreclosure of their homes, that BOA wanted to assist homeowners in maintaining homeownership, and that BOA would "help" Plaintiffs and other borrowers who applied for such assistance.

70.     However, these offers of assistance from BOA to Plaintiffs and millions of other borrowers were designed solely to induce consumer reliance of those Plaintiffs and other borrowers who received them. BOA's true intent was to get as many Plaintiffs and other borrowers to apply for modification assistance and then purposefully hinder those modification requests, so as to leave them in abeyance, by design, in order to profit from the servicing of defaulted mortgage loans.

71.     The senior management teams of BOA and CEO Brian Moynihan knew of the falsity of the misrepresentations made in those offers of assistance, knew those offers would induce consumer reliance, and knew that those homeowners applying for said modification assistance would be harmed by BOA's misrepresentations contained in those offers of assistance.

72.     In facilitation of this fraudulent scheme, BOA restructured its corporate hierarchy after acquiring Countrywide in 2008. Acting under Bank of America CEO, Brian Moynihan, Barbara Desoer became President of Bank of America Home Loans and Insurance (HLI), which oversees the mortgage servicing operations of BOA, including its Home Retention Division (HRD). Kenneth Scheller became BOA Senior Vice President and manager of HRD. Separate from HRD, but still under BOA's servicing unit umbrella, exists the Executive Customer Relations Group (ECR).

73.     BOA's ECR Group contracted with companies, such as Urban Lending Solutions (Urban), to handle services related to BOA's participation in HAMP.

74.     Urban, a private company based in Pittsburgh, PA with offices in Broomfield, CO, provides a variety of outsourced services to the mortgage servicing industry.

17

75.     BOA (through their ECR Group) outsourced to Urban a significant amount of modification requests of BOA's customers, including HAMP inquiries, document submissions and eligibility determinations.

76.     Urban's work for BOA took place at two worksites. One of these sites, Urban's "390" Group (so named because then located at 390 InterLocken Crescent, Broomfield, CO), received and scanned incoming modification financial documentation and other paperwork from Plaintiffs and other homeowners serviced by BOA, and stored those documents in what became the Urban Digital Portal digital imaging repository.

77.     BOA, through Urban, solicited and directed homeowners to return documents, via FedEx, to this Urban location, which received hundreds of thousands of FedEx packages from homeowners seeking modification assistance from BOA.

78.     Urban hired scores of employees at the "390" group to accept and scan millions of pages of original documents, including Plaintiffs' and other homeowners financials, which were saved on the Urban Portal.

79.     This document Portal, operated by Urban, at BOA's direction, became a virtual "black hole" for Plaintiffs' and other homeowners' documents, when requesting modification assistance, allowing BOA, and Urban employees assisting BOA, to fraudulently deny receiving documents homeowners had sent to BOA, at Urban's "390" group location.

80.     Another Urban Broomfield location (11802 Ridge Parkway) housed Urban's Outsourced Services unit, offering comprehensive vendor services custom-tailored for clients such as BOA. This location was responsible for handling escalated homeowner complaints regarding modification requests.

81.     BOA committed to making Urban a Tier 1 vendor in exchange for working with BOA to meet its goals to fraudulently and purposefully keep Plaintiffs and millions of other homeowners requests for modification assistance in abeyance, so as to allow BOA to maximize servicing related income from the servicing of defaulted mortgage loans. Said Tier

1 vendor status offered Urban the prospect of hundreds of millions of dollars in revenue in the years ahead.

82.     Urban employees were given BOA titles within BOA's Office of the CEO and President. Plaintiffs and other homeowners were instructed to contact BOA through telephone numbers which went directly to Urban's Broomfield location. To the Plaintiffs and other homeowners seeking assistance from BOA, Urban's employees were indistinguishable from BOA's own employees.

83.     With the assistance of Urban, BOA's fraudulent scheme subjected the applicant Plaintiffs and other homeowners to a daunting challenge of misinformation, lost document claims, repetitive requests for documents already supplied and all manner of tactics designed to purposefully stall or otherwise hinder the modification application process, as a matter of policy, approved by the CEOs of both the BOA and Urban Defendants, and carried out with the assistance of Urban, using Plaintiffs and other homeowners as unwitting pawns during futile attempts at modification.

84.     In furtherance of their fraudulent scheme, the senior management teams of the BOA and Urban Defendants, and CEOs Brian Moynihan and Charles Sanders (of BOA and Urban, respectively) approved, condoned and allowed to be executed corporate policies that allowed for their companies agents to; a) falsely deny receiving documents from Plaintiffs and others when applying for modification consideration, b) lie to Plaintiffs and others regarding their eligibility for modification, c) intentionally force Plaintiffs and others to wait months or years before determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests and risk of eligibility loss to Plaintiffs and others, e) purposefully fail to properly review Plaintiffs' and others requests for modification assistance, f) falsely deny eligibility when eligibility should have been granted, g) and purposefully allow Plaintiffs' and others modification documents to continually expire, requiring resubmission, in a deliberate effort to keep their mortgage loans in a near perpetual state of default all as part of a well organized

fraudulent scheme to increase corporate profit through gains from the servicing of defaulted mortgage loans.

**v.)    Servicers Financial Incentives Against Modification**

85.     There are a number of financial factors that make it far more profitable for each Servicer Defendant to avoid modification, continue to keep a mortgage in a semi-permanent state of default or distress, and to eventually push loans toward foreclosure or short sale.

86.     Stipulated in all Prospectus and/or Prospectus Supplements is a requirement that mortgage servicers must forward, from their own funds, monthly advances to each Trust they service mortgages for. These advances regularly include payments of principal and interest, to the Trust, of all mortgages in a given pool of mortgages, including those payments of non-performing loans and REO properties. In other words, when a borrower does not make the monthly scheduled payment of principal and interest, the servicer is required to "advance" that borrower's payment to said Trust. These payments are referred to as delinquency advances, periodic advances, or simply "advances". There are also other types of servicing advances required to be made by servicers stated in Prospectus' and/or Prospectus Supplements including, but not limited to, property inspections, broker price opinions, appraisals, property management and maintenance, legal fees, service processing, etc.

87.     Further stated in all Prospectus' and/or Prospectus Supplements, advances made by a servicer are recoverable by the servicer through either standard collection practices (from the borrower) or once a property, as security for a mortgage in the pool, is foreclosed on and the property (now considered Real Estate Owned or REO property of the Trust) is eventually liquidated. In the case of a liquidation of a property, the servicer is paid as first order of priority from the proceeds of said liquidation. Furthermore, recovery of advances often includes interest on the funds advanced enabling the Servicer Defendants to actually earn interest income from their advances made.

88.     Entering into a permanent modification will often significantly delay a servicer's ability to recover advances it is required to make to a Trust as compared to the aforementioned

20

foreclosure/liquidation scenario.  This is due to the practice of adding those advances to the principal balance of the loan when a modification is made, thereby spreading out the recovery of those advances by the servicer, over the life of the loan. Also, a servicer's right to recover expenses from a Trust in a loan modification, rather than a foreclosure, is less clear and less generous.

89.     Considering that mortgage servicers are only interested in their own respective profitability (having no ownership interest in the Trust's assets), they are greatly incentivized against modification even further by these pooling and servicing agreement requirements.

90.     Moreover, by exploiting loopholes in pooling and servicing agreements, each Servicer Defendant profits handsomely by routinely using the "borrower is applying for a modification" excuse to justify delaying the foreclosure of defaulted mortgages to Trusts and regulatory agencies, for a time lengthily enough to incur a significant amount of aforementioned servicing advances, and foreclosing when defaults have effectively "ripened", making full recovery of said advances, often with interest.

91.     This is done by stringing along borrowers' attempts at modification, as aforementioned in preceding paragraphs, so as to justify the time delay to the Trusts and government regulatory agencies, used primarily to allow the bill for servicing advances to pile up. Furthermore, this reimbursement structure limits a mortgage servicer's incentive to rein in foreclosure costs and actually incentives them to increase and pad the costs of foreclosure.

92.     Servicers will charge for unnecessary work and/or work that was never done (referred to in the mortgage securitization industry as "Junk Fees in an effort to increase the costs of foreclosure and subsequently the amount of servicing advance fees recovered when a foreclosure and liquidation of property eventually takes place.

93.     This is all a clever, fraudulent, misleading, and deceptive balancing act employed by each Servicer Defendant to maximize profits using Plaintiff borrowers and others as unwitting pawns when they applied for modification assistance. While the Servicer Defendants are making servicing advances, they appear to be losing money on the foreclosure process, yet

this is offset later when recovery is made (after foreclosure and final liquidation of property) and profit is realized from the recovery of all the necessary, unnecessary, and fraudulent servicing advances claimed to be paid out by the Servicer Defendants, plus interest.

94.     These advances are recovered by the Defendant Servicers as the first order of payment priority from sale proceeds upon liquidation (sale by the Trust) of a foreclosed property. To the Servicer Defendants, advances they are required to make with respect to defaulted mortgages, as stated in the pooling and servicing agreements with the Trusts for which they service mortgages for, are quite literally like "money in the bank".

95.     It is by employing these types of fraudulent, deceptive, and misleading business practices, by exploiting loopholes in the pooling and servicing agreements they are contractually bound to adhere to, and using the modification requests in tandem to cover their tracks, the Servicer Defendants have made obscene profits from the servicing of defaulted residential mortgage loans while knowingly causing significant harm to the named Plaintiffs and millions of other homeowners, the bond-holders of the Trusts for which they service mortgages for, and the public's economic well being at large.

96.     This was done at the expense of the Plaintiffs and other borrowers applying for modifications that are given false hope and suffer the indignities of significant emotional and mental distress during laborious, lengthy, and futile attempts in seeking modification assistance.

97.     The Plaintiffs, other borrowers, and the bond-holders of the various Trusts are left holding the bag in the end, when foreclosure finally takes place, and the property is liquidated for a fraction of the mortgages' value, while the Servicer Defendants reap billions of dollars in profits derived from illicit servicing fees based on values of pools of mortgages that have been artificially inflated by the Servicer Defendants' fraudulent, willful, and purposeful false representations to be offering assistance to Plaintiffs and others in good faith when they applied for modification of their mortgage loans.

22

98.     Had each Servicer Defendant properly performed in reviewing Plaintiffs' requests for modification, followed HAMP guidelines and its mandate to assist homeowners and prevent avoidable foreclosures as they agreed to do when executing the HAMP SPA, Plaintiffs would not have lost their homes to foreclosure, or suffered the extreme mental and emotional distress they were subjected to during the modification application process.

99.     The identities of the CEOs of the Servicer Defendants who designed, instituted, condoned and/or otherwise approved their respective organizations policies, and caused to be executed the aforementioned fraudulent scheme, misrepresentations in published offers of assistance, and misconduct as noted herein, are as follows;

| | | |
|---|---|---|
| i. | Brian Moynihan | Bank of America & its subsidiaries |
| ii. | Kenneth D. Lewis | Bank of America & its subsidiaries |
| iii. | Ken Scheller | BAC Home Loans Servicing, LP |
| iv. | Barbara Desoer | Bank of America Home Loans & Insurance |
| v. | Chuck Sanders | Urban Lending Solutions |
| vi. | John Stumpf | Wells Fargo & its subsidiaries |
| vii. | Paul Hazen | Wells Fargo & its subsidiaries |
| viii. | Ronald M. Faris | Ocwen |

## B.     NAMED PLAINTIFFS' FACTS & ALLEGATIONS

### Timothy P. Mooney & Susan Mooney v. Wells Fargo Bank, N.A.

100.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

23

101.     Plaintiff Timothy P. Mooney & Susan Mooney are citizens of the State of

Massachusetts residing at, and claim to be the rightful owners of 43 South Street, Kingston,

MA 02364, which is the subject property incorporated and referred to herein.

102.     On or about June 11, 1999, Plaintiffs gave a first Mortgage and Note to Fleet

Mortgage Corp. in the original principal amount of $154,000.00, secured by said subject

property. Said mortgages were recorded in the Plymouth County Registry of Deeds, on June

16, 1999, in Book 17565, at Page 334.

103.     The servicing rights to Plaintiffs' mortgage loan subsequently became to be serviced

by Washington Mutual, as successor by merger to Fleet, and eventually by Servicer Defendant

Wells Fargo Bank, N.A.(Wells Fargo), via assignment from Washington Mutual.

104.     On or about January 2010, Plaintiffs experienced financial hardship which caused

them to be unable to make their mortgage payments.

105.     On or about December 2010, Plaintiffs received an offer of modification assistance,

via mail, from Wells Fargo Home Mortgage (a division or wholly owned subsidiary of Wells

Fargo Bank, N.A.), servicer of Plaintiffs' mortgage. Said offer represented that Wells Fargo

was offering assistance to borrowers under the federal government's HAMP, encouraged

Plaintiff to apply for modification assistance, and that Wells Fargo would assist Plaintiffs in

good faith.

106.     Plaintiffs relied on the representations Wells Fargo made in said offer of assistance

and made an application to Wells Fargo, for consideration for their mortgage to be modified

under the guidelines and supplemental directives of the U.S. Treasury Department's Making

Home Affordable Home Affordable Modification Program by sending their request, personal

financial information, tax information, and a statement attesting to their hardship on or about

February 24, 2011.

107.     Wells Fargo responded to Plaintiffs' February 24, 2011 request, via a letter dated

March 1, 2011, which stated the "investor who ultimately owns" Plaintiffs' mortgage loan had

declined their request for modification assistance (Exhibit 1). Plaintiffs allege that this letter

was also further misrepresentation by Wells Fargo regarding their eligibility for modification under HAMP, due to the alleged fact that Plaintiffs mortgage loan and Note were acquired by Trustee Defendant Federal Home Loan Mortgage Corporation (FHLMC and/or Freddie Mac), an administrator of the HAMP program itself, and that all FHLMC mortgage loans are eligible for modification consideration under HAMP.

108.     Plaintiffs immediately called Wells Fargo upon receiving said March 1, 2011 letter and spoke to a customer service representative named Latia Tillman. Ms. Tillman informed Plaintiffs that in order for Plaintiffs to continue to request further modification review, the investor would require that they would have to pay $7,631.00 not later than March 11, 2011, which again Plaintiffs allege was further misrepresentation as borrowers seeking HAMP consideration are not required to tender payment in order for consideration.

109.     Ms. Tillman further instructed Plaintiffs to resubmit all of the application documents along with personal financial information, tax information, and a statement attesting to their hardship to Ms. Tillman's attention. Plaintiffs complied with Ms. Tillman's request, sending the payment requested to Wells Fargo, via Western Union Quick Collect, on March 11, 2011, and faxed the documents requested to Ms. Tillman's attention, on March 28, 2011.

110.     In May 9, 2011, Plaintiffs again contacted Wells Fargo seeking a status of their modification request. They spoke again with Ms. Tillman, who instructed them to forward pay records for the previous month to update their request. Plaintiff complied by sending their previous month's pay records to Wells Fargo, via fax, on May 17, 2011.

111.     In June of 2011, Plaintiffs again contacted Wells Fargo seeking a status of their modification request. They spoke with a customer service representative who informed Plaintiffs that all of their modification request documents had expired and that an entire new package would have to be submitted in order for Wells Fargo to proceed with consideration of Plaintiffs modification request.

112.     Plaintiffs again complied with Wells Fargo's request and resubmitted all of the application documents along with personal financial information, tax information, and a statement attesting to their hardship, via fax, on June 29, 2011.

113.     This process of Plaintiffs' submitting documentation to Wells Fargo and then being told by Wells Fargo to resubmit the same documentation already submitted previously, was repeated every two months through December of 2011, at which time Plaintiffs received a letter from Wells Fargo, dated December 22, 2011, stating that again Plaintiffs would be required to forward a complete HAMP modification request and supporting documentation in order for Wells Fargo to determine Plaintiffs eligibility for modification. (Exhibit 2)

114.     Plaintiffs complied with said December 22, 2011 request and resubmitted, via fax, all application documents along with personal financial information, tax information, and a statement attesting to their hardship to Wells Fargo on December 28, 2011.

115.     Plaintiffs received another letter from Wells Fargo dated January 6, 2012 (Exhibit 3), requesting resubmission of many of the documents sent by Plaintiffs on December 28, 2011. Plaintiffs again complied with this request for "additional" documentation, by faxing the requested documents, again, on January 10, 2012.

116.     Attempting to ensure that Wells Fargo did in fact receive all of the documents sent to them, Plaintiffs called Wells Fargo on January 20, 2012. Wells Fargo's customer service representative informed Plaintiffs that the documents were in fact received but another request for modification affidavit (RMA) would need to be filled out, with additional information. Plaintiffs complied with said request and filled out yet again another RMA and faxed it to Wells Fargo on January 24, 2011. To ensure Wells Fargo had received said RMA, Plaintiffs re-faxed said document two additional times on February 2, 2012 and February 8, 2012.

117.     On March 1, 2012, Plaintiffs received a letter from Wells Fargo, dated February 24, 2012, stating that Plaintiffs did not meet the requirements for modification consideration under HAMP because Plaintiffs had not provided Wells Fargo with the documents they requested. (Exhibit 4)

118.      On March 12, 2012, Plaintiffs received a further offer of assistance from Wells

Fargo, dated March 6, 2012 (Exhibit 5), which continued to encourage Plaintiffs to attempt to

re-apply for modification of their mortgage. Said letter was signed by Randy Bockenstedt,

Senior Vice President of Servicing for Wells Fargo Home Mortgage and included statements

such as, but not limited to; "even if we've already spoken to you about mortgage assistance

programs, we'd like to speak to you about the mortgage assistance options that may still be

available to you."; "call us at…to find out if your eligible for a loan modification", "We're

ready to help…"

119.      Plaintiffs continued to contact Wells Fargo and attempted to further along their

modification request throughout the months of April, May, June, July, August, and September

of 2012, right up until Wells Fargo, acting as nominee for FHLMC, as Trustee of an as yet

identified FHLMC Pool (Trust), auctioned the subject property at foreclosure sale, on or about

October 3, 2012, all while plaintiffs were filing complaints with Wells Fargo and the Making

Home Affordable HAMP complaint case escalation department in an effort to resolve their

situation.

120.      During the entire one year and six months since Plaintiffs first applied for the HAMP

program they suffered extreme emotional and mental distress as the customer service agents

of Wells Fargo, acting on corporate policy approved, condoned and ordered executed by the

CEO and senior management executives of Wells Fargo, did in fact; a) falsely deny receiving

documents from Plaintiffs when applying for modification consideration, b) lie to Plaintiffs

regarding their eligibility for modification, c) intentionally force Plaintiffs to wait months

before determining and communicating modification eligibility, d) purposely fail to

communicate deadlines, incompleteness of documentation, status of modification requests to

Plaintiffs, e) purposefully fail to properly review Plaintiffs' requests for modification

assistance, f) purposefully allow Plaintiffs' modification documents to continually expire,

requiring resubmission, and employ all manner of hindering the modification process by

design in order to keep Plaintiff's request for modification assistance in abeyance, all as part

of a well organized fraudulent scheme to increase corporate profit through gains from the servicing of defaulted mortgage loans.

121.    The Wells Fargo Defendants deceptively, unfairly, and fraudulently misled Plaintiffs with their offers of modification assistance, thereby inducing Plaintiffs' reliance therein and instead hindered Plaintiffs' legitimate request for modification assistance, so as to maximize servicing income and recoverable servicing expenses by keeping Plaintiffs' modification request in purposeful abeyance.

122.    The Wells Fargo senior management team, including Randy Bockenstedt, and CEOs, John Stumpf and Paul Hazen, knew the published offers of modification assistance, they had designed and approved, sent to Plaintiffs and others (and published on Wells Fargo's web-sites) were in fact false representations of Wells Fargo's true intentions when offering modification assistance to Plaintiffs and others.

123.    Plaintiffs' relied on Wells Fargo's offers of modification assistance. Rather than assist Plaintiffs, the Wells Fargo purposefully hindered their modification requests as aforementioned.

124.    Plaintiffs' accepted and acted on those offers of assistance, by applying for modification of their mortgage loan, and such reliance was reasonable. Plaintiffs' relied on these offers of assistance that they would actually be assisted with their modification request, and further relied on the Wells Fargo Defendants' offers of assistance, to follow HAMP Guidelines when applying for modification of their mortgage loan and such reliance was to Plaintiffs' detriment as aforementioned.

125.    The senior management teams and CEO of Wells Fargo knew of the falsity of the misrepresentations made in those offers of assistance, knew those offers would induce consumer reliance, and knew that those homeowners applying for said modification assistance would be harmed by Wells Fargo's misrepresentations contained in those offers of assistance

126.    Plaintiffs were owed a reasonable duty of care, by Wells Fargo, when they offered modification assistance, to ensure that Plaintiffs were not exposed to substantial risk of loss.

The Wells Fargo Defendants were negligent in that duty and breached said duty by knowingly exposing Plaintiffs to substantial risk of loss.

127.     The Wells Fargo Defendants' fraudulent misrepresentations, misconduct and negligence caused Plaintiff harm which was reasonably foreseeable.

128.     Had the Wells Fargo Defendants properly performed in reviewing Plaintiffs requests for modification, Plaintiffs would not have lost their home to foreclosure, or suffered the extreme mental and emotional distress they were subjected to during the modification application process.

129.     As a direct result of the Wells Fargo Defendants' fraudulent misrepresentations, deceitful business practices, misconduct and negligence, Plaintiffs suffered quantifiable damages such as loss of equity in their home, money spent on legal defense of foreclosure and eviction.

130.     As a direct result of the Wells Fargo Defendants' fraudulent misrepresentations, deceitful business practices, misconduct and negligence, Plaintiffs suffered general damages such as loss of property interest, negative impact to their credit rating, extreme emotional distress as the result of being hindered during their attempts at modification, their modification requests being purposefully kept in abeyance and extreme emotional distress as the result of foreclosure actions against them.

**Kim Chounsvathmao v. BAC Home Loans Servicing, LP, Urban Lending Solutions, & Bank of America, N. A.**

131.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

132.     Individual and Representative Plaintiff Kim Chounsvathmao is a citizen of Massachusetts residing at, and claims to be the rightful owner of 9 Rockland Street, Lynn, MA 01902 which is one of the subject properties referenced herein

133.     On or about October 20, 2005, Plaintiff was given a mortgage loan of Two Hundred Thirty One Thousand and 00/100 ($231,000.00) by Virtual Bank, a division of Lydian Private

Bank. Said mortgage was recorded on October 27, 2005 in the Essex County South Registry of Deeds in Book 25003, at page 128.

134.     Sometime after executing said Note and Deed of Trust, Countrywide Home Loans obtained the servicing rights to Plaintiff's mortgage loan and subsequently was serviced by Servicer Defendant BAC Home Loans Servicing, LP, as successor in interest to Countrywide.

135.     On or about July 2009, Plaintiff experienced financial hardship which caused her to be unable to make her mortgage payments.

136.     On or about July 19, 2010, Plaintiff received an offer of modification assistance, via mail, from BAC Home Loans Servicing, LP (BAC), servicer of Plaintiff's mortgage. Said offer, dated July 13, 2010, represented that BAC was offering the federal government's HAMP, stated that "[BAC] encourage[d] [Plaintiff] to take the next step and apply for the Home Affordable modification Program today", and that BAC would be working with Urban Lending Solutions in order to expedite the loan modification process. (Exhibit 6)

137.     Said letter offering assistance, was sent in a package from Defendant Urban's "390" Group's address and contained a pre-paid return Fed-Ex label address to same for Plaintiff to return her documents. Additionally said package contained a disclosure letter from Urban Lending Solutions which stated "[Urban] *would like to reassure* [Plaintiff] *that* [Urban has] *been retained to assist BAC Home Loans Servicing, LP with its efforts to reach customers who may be eligible for the Home Affordable Modification Program.*" And  "*The true purpose of these letters are to obtain a more affordable payment for* [Plaintiff]." (Exhibit 6, *Id. pp. 2*)

138.     Plaintiff also visited Bank of America's website, which further published offer of modification assistance representing that BOA would, in good faith, help Plaintiff, and further encouraged Plaintiff to apply for modification.

139.     Plaintiff relied on these aforementioned representations contained in those offers of assistance and made an application to the Defendant BAC Home Loans Servicing, LP, for consideration for her mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable

Modification Program and forwarded her request to Urban's "390" group location, that included personal financial information, tax information, and a statement attesting to her hardship on or about July 22, 2010.

140.     Plaintiff then received a modification application package from BAC on or about August 10, 2010, via Federal Express, requesting that the documents inside said package (the identical documents Plaintiff had sent with her July 22, 2010 modification review request) be filled out again and returned by Plaintiff to Urban's "390" group location, along with personal financial information, tax information, and a statement attesting to her hardship.

141.     Plaintiff complied with this additional request and did return said modification application package, with the documents requested, to BAC, at Urban's "390" group location on or about August 17, 2010.

142.     Plaintiff spoke with BAC customer service representatives (actually Urban employees acting on behalf of BOA) and was lied to about the status of her modification request, eligibility status and eligibility determination as follows, but not limited to;

| Call Date | Response of BAC/Urban Customer Service Representative |
|---|---|
| 8/20/2010 | "All documents received. File looks good. Call back end of the week." |
| 8/26/2010 | "File under review.  No additional documents needed. Call back weekly for status checks." |
| 9/7/2010 | "Request in review. Call back next week." |
| 9/13/2010 | "Request going to underwriting. 40- 90 days processing time." |
| 9/20/2010 | "Request going to underwriting" |
| 9/27/2010 | "Request still under review." |
| 10/4/2010 | "Requests still in review. Call back weekly for status." |
| 10/7/2010 | "Requests going to underwriting." |
| 10/12/2010 | "Request pending review from underwriting." |
| 10/14/2010 | "File not assigned to underwriter yet. One will be assigned today." |
| 10/27/2010 | "File being assigned today call next week for status." |

31

| 11/1/2010 | "File being assigned today." |
| 11/3/2010 | "File being escalated." |
| 11/8/2010 | "File escalated. Continue to make status checks." |
| 11/30/2010 | "BAC sending another package. You are only eligible for HAMP. |
| | and the documents have expired so fill out new package and return." |
| 1/20/2011 | "File was thrown out. We are resending another one." |
| 2/15/2011 | "Need additional documentation" |

143.    Each time she was told to provide missing documentation, Plaintiff provided it in a prompt and timely manner by faxing the requested documents directly to the fax numbers she was provided by said BAC/Urban customer service representatives.

144.    This pattern of Plaintiff sending modification documents to BAC (Urban) and then receiving a request, from BAC (Urban), to re-submit documentation already provided by Plaintiff, repeated over and over again until June 20, 2011, when Plaintiff's mortgage was foreclosed by BAC, acting as nominee for Defendant Federal National Mortgage Association.

145.    Plaintiff was led to believe, by BAC/Urban customer service representatives that her modification request was still in active review and her mortgage would not be foreclosed on, right up and until the date of foreclosure auction.

146.    Additionally, Plaintiff was never provided with a modification eligibility determination, in writing or otherwise.

147.    During the entire one year Plaintiff applied for the HAMP program she suffered extreme emotional and mental distress as the customer service agents of BAC, including those working for BOA through Urban Lending Solutions, acting on corporate policy designed, approved, condoned and ordered executed by CEO Brian Moynihan and senior management executives of the Bank of America, and Urban CEO Charles Sanders, did in fact; a) falsely deny receiving documents from Plaintiff when applying for modification consideration, b) lie to Plaintiff regarding her eligibility for modification, c) intentionally force Plaintiff to wait months before determining and communicating modification eligibility, which was never

communicated at all d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests to Plaintiff, e) purposefully fail to properly review Plaintiff's requests for modification assistance, f) purposefully allow Plaintiff's modification documents to continually expire, requiring resubmission, g) attempt to foreclose Plaintiff's mortgage loan in violation of HAMP guidelines[1], and employ all manner of hindering the modification process by design in order to keep Plaintiff's request for modification assistance in abeyance, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the  servicing of defaulted mortgage loans.

148.    The BOA & Urban Defendants deceptively, unfairly, and fraudulently misled Plaintiffs with their offers of modification assistance, thereby inducing Plaintiffs' reliance therein and instead hindered Plaintiffs' legitimate request for modification assistance, so as to maximize servicing income and recoverable servicing expenses by keeping Plaintiffs' modification request in purposeful abeyance.

149.    The BOA senior management team, including Barbara Desoer and Kenneth Scheller, and CEO, Brian Moynihan and Urban CEO Charles Sanders, knew the published offers of modification assistance, they had designed and approved, sent to Plaintiffs and others (and published on BOA's web-sites) were in fact false representations of BOA's and Urban's true intentions when offering modification assistance to Plaintiff and others.

150.    Plaintiff relied on BOA's and Urban's offers of modification assistance. Rather than assist Plaintiff, BOA, with assistance from Urban purposefully hindered Plaintiff's modification requests as aforementioned.

151.    Plaintiff accepted and acted on those offers of assistance, by applying for modification of her mortgage loan, and such reliance was reasonable. Plaintiff relied on these offers of assistance that she would actually be assisted with her modification request, and further relied on the BOA, BAC, & Urban's offers of assistance, and BOA and BAC to follow

---

[1] Plaintiffs' do not claim a right of private action under HAMP.

HAMP Guidelines when in reviewing her request for modification of her mortgage loan and such reliance was to Plaintiffs' detriment as aforementioned.

152.     The senior management teams and CEO's of BOA & Urban knew of the falsity of the representations made in those offers of assistance, knew those offers would induce consumer reliance, and knew that those homeowners applying for said modification assistance would be harmed by BOA, BAC, & Urban's misrepresentations contained in those offers of assistance, with statements such as, but not limited to; "[Urban] *would like to reassure [Plaintiff] that [Urban has] been retained to assist BAC Home Loans Servicing, LP with its efforts to reach customers who may be eligible for the Home Affordable Modification Program*."; and  "*The true purpose of these letters are to obtain a more affordable payment for [Plaintiff].*"; and  *BAC was offering the federal government's* HAMP,; and that "[BAC] *encourage*[d] [Plaintiff] *to take the next step and apply for the Home Affordable modification Program today*"; and that BAC would be working with Urban Lending Solutions in order to "*expedite*" the loan modification process.

153.     Plaintiff was owed a reasonable duty of care, by BOA, BAC & Urban, when they offered modification assistance, to ensure that Plaintiff was not exposed to substantial risk of loss. The BOA, BAC & Urban Defendants were negligent in that duty and breached said duty by knowingly exposing Plaintiffs to substantial risk of loss.

154.     The BOA, BAC, & Urban Defendants' fraudulent misrepresentations, misconduct and negligence caused Plaintiff harm which was reasonably foreseeable.

155.     Had the BOA, BAC, & Urban Defendants properly performed in reviewing Plaintiff's requests for modification, Plaintiff would not have lost her home to foreclosure, or suffered the extreme mental and emotional distress she was subjected to during the modification application process.

156.     Plaintiff was owed a proximate reasonable duty of care by the Urban Defendant when assisting BOA & BAC in the processing of Plaintiff's and other homeowners requests

for modification assistance, to ensure that Plaintiff and other homeowners were not exposed to substantial risk of loss.

157.     As a direct result of the BOA & BAC Defendants' fraudulent misrepresentations, deceitful business practices, misconduct and negligence, Plaintiff suffered quantifiable damages such as loss of equity in her home, money spent on legal defense of foreclosure and eviction.

158.     As a direct result of the BOA & BAC Defendants' fraudulent misrepresentations, deceitful business practices, misconduct and negligence, Plaintiff suffered general damages such as loss of property interest, negative impact to her credit rating, extreme emotional distress as the result of being hindered during her attempts at modification, her modification requests being purposefully kept in abeyance and extreme emotional distress as the result of foreclosure actions against her.

159.     Plaintiff relied on the BOA, BAC & Urban Defendants' offers of modification assistance. Rather than assist Plaintiff, the BOA & BAC and Urban Defendants' purposefully hindered her modification request as aforementioned.

160.     Plaintiff accepted and acted on those offers of assistance, by applying for modification of her mortgage loan, and such reliance was reasonable. Plaintiff relied on these offers of assistance that they would actually be assisted with their modification request, and further relied on the BOA & BAC Defendants' good faith offers of assistance, to follow HAMP Guidelines when applying for modification of her mortgage loan and such reliance was to Plaintiff's detriment as aforementioned.

161.     Plaintiff was owed a reasonable duty of care, by the BOA, BAC & Urban Defendants, when they offered modification assistance, to ensure that Plaintiff was not exposed to substantial risk of loss. The BOA, BAC, & Urban Defendants were negligent in that duty and breached said duty by knowingly exposing Plaintiffs to substantial risk of loss.

162.     The BOA, BAC, and Urban Defendants' fraudulent misconduct and negligence caused Plaintiff harm which was reasonably foreseeable.

163.     As a direct result of the BOA, BAC & Urban Defendants' fraudulent misrepresentations, deceitful business practices, misconduct and negligence, Plaintiff suffered quantifiable damages in that she now owes far more money on her mortgage loan (as deficiency balance from foreclosure) than if her modification request had been properly processed and administrated in a timely fashion, instead of being purposefully hindered and kept in abeyance, and money spent on legal defense of foreclosure and eviction.

164.     As a direct result of the BOA, BAC & Urban Defendants' fraudulent misrepresentations, deceitful business practices, misconduct and negligence, Plaintiff suffered general damages such as loss of property interest, negative impact to her credit rating, extreme emotional and mental distress as the result of being hindered during her attempts at modification, her modification requests being purposefully kept in abeyance and extreme emotional and mental distress as the result of foreclosure actions against her, the loss of her homeownership, and the subsequent eviction actions against her.

### James B. & Tammy E. Colbert v. Wells Fargo Bank, N.A. & America's Servicing Company

165.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

166.     Plaintiff James B. & Tammy E. Colbert are citizens of the State of Massachusetts residing at, and claim to be the rightful owners of 8 Evergreen Road, Plainville, MA 02762, which is the subject property incorporated and referred to herein.

167.     On March 13, 2006, Plaintiffs gave a first Mortgage and Note to WMC Mortgage Corp. in the original principal amount of $224,000.00, secured by said subject property. Said mortgages were recorded in the Norfolk County Registry of Deeds, in Book 23478, at page 315.

168.     A short time after being granted said mortgage loan, Wells Fargo Bank, N.A. was granted servicing rights to Plaintiff's mortgage loan which subsequently became to be serviced by Servicer Defendant Americas Servicing Company (ASC), a wholly owned subsidiary of Wells Fargo Bank, N.A.

169.    However, unknown to Plaintiffs at the time, on or about April - May 2006 WMC Mortgage Corp. pooled and sold Plaintiffs' Note and Mortgage to the Morgan Stanley ABS Capital I, Inc. Trust 2006-WMC2 (Trust). Deutsche Bank National Trust Company (Deutsche Bank) was appointed Trustee of said Trust.

170.    Sometime during 2007, Plaintiffs experienced financial hardship which caused them to be unable to make their mortgage payments.

171.    On or about April 7, 2008, Wells Fargo Bank, N.A. recorded a modification of Plaintiffs' mortgage loan in the Norfolk County Registry of Deeds, in Book 25662, at page 423.

172.    Said modification failed to assist Plaintiffs in a manner so as to enable them to continue to make timely payments on their mortgage loan and within a few months Plaintiffs again fell behind on their monthly mortgage payments.

173.    On or about January 2009, Plaintiffs sought further modification assistance from the current servicer of their loan ASC (Wells Fargo Bank, N.A d.b.a. ASC).

174.    On March 26, 2009 ASC sent a letter to Plaintiffs informing them that their request for loan modification had been denied.

175.    On April 13, 2009, Wells Fargo signed a Servicer Participation Agreement ("SPA") with the U.S. Treasury on April 13, 2009 agreeing in its capacity as loan servicer to participate in HAMP, to abide by HAMP's requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.

176.    On April 27, 2009, ASC sent Plaintiffs an offer to apply for HAMP. Said Offer encouraged Plaintiffs to apply for a HAMP modification with representations such as "*Call now...the government's new Home Affordable Modification program may help you keep your home.*"; and "*We'd like to help you...*"; and "*We're here for you.*" Said letter was signed by Ben Windust, Senior Vice President of Wells Fargo Home Mortgage. (Exhibit 7)

177.    Plaintiffs relied on these aforementioned representations contained in this offer of assistance and made an application to the Defendant Wells Fargo Bank, N.A. (d.b.a./ ASC),

for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program and forwarded their request, which included personal financial information, tax information, and a statement attesting to their hardship on or about May 6, 2009.

178.    On May 14, 2009, ASC sent Plaintiffs a letter thanking Plaintiffs for contacting ASC regarding their financial hardship and offering Plaintiffs a special forbearance plan, rather than the HAMP modification Plaintiffs had applied for. (Exhibit 8)

179.    On or about June of 2009, ASC sent Plaintiffs a modification agreement. (Exhibit 9) Said modification agreement was not a HAMP modification. The modification agreement indicated on the first page that Plaintiffs mortgage was a Fannie Mae mortgage by stating a Fannie Mae loan number associated with Plaintiffs mortgage loan, in the upper right hand corner of the first page of said modification agreement document. Having researched HAMP Guidelines on the U.S. Treasury Departments web site, Plaintiffs thought it was strange they were being offered a non-HAMP modification, if their mortgage was owned by Fannie Mae, as the HAMP information they had researched stated that all Fannie Mae mortgages were in fact eligible for HAMP.

180.    In an effort to try to remain current on their mortgage loan, and to continue to maintain ownership of their home, Plaintiffs executed and returned said modification agreement to ASC.

181.    On July 21, 2009, Wells Fargo Bank, N.A. d.b.a. ASC, recorded said modification agreement in the Norfolk County Registry of Deeds, in Book 26907, at page 583.

182.    Still experiencing financial hardship and being granted a non-HAMP modification, which did not assist Plaintiffs enough to allow them to remain current on their monthly mortgage obligation, Plaintiffs again became delinquent on their mortgage loan on or about August 2009.

183.    In an effort to seek assistance under the HAMP program, which Plaintiffs believed would lower their monthly mortgage payment to an affordable level, Plaintiffs continued to apply to ASC for assistance under HAMP beginning again in September of 2009 by forwarding another application to the Defendant Wells Fargo Bank, N.A. (d.b.a./ ASC), for consideration for their mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program, which included personal financial information, tax information, and a statement attesting to their continued hardship.

184.    From September 2009 through May 2012, Plaintiffs continued to re-apply for HAMP assistance through ASC.

185.    Plaintiffs allege they were repeatedly told by ASC's customer service representatives that the documents they had recently sent to ASC had not been received or had expired and Plaintiffs were encouraged by ASC's customer service representatives to continue to re-submit said missing or expired documents. Plaintiffs fully complied with these repeated document re-submission requests in a timely manner, on an almost monthly basis for 33 consecutive months.

186.    Plaintiffs further allege that ASC never communicated a determination regarding Plaintiffs eligibility for assistance under HAMP.

187.    On May 15, 2012, Harmon Law Offices, P.C. sent Plaintiffs Notice of Mortgage Foreclosure Sale, having been retained by Defendant Deutsche Bank to foreclose Plaintiffs' mortgage.

188.    Harmon Law Offices, P.C. set foreclosure auction date for June 14, 2012. On or about June 14, 2012, Deutsche Bank purchased Plaintiffs' subject property at public auction, in its capacity as Trustee for the Morgan Stanley ABS Capital I, Inc. Trust 2006-WMC2.

189.    During the entire three years since Plaintiffs first applied for the HAMP program they suffered extreme emotional and mental distress as the customer service agents of Wells Fargo, acting on corporate policy approved, condoned and ordered executed by the CEO and

senior management executives of Wells Fargo, did in fact; a) falsely deny receiving documents from Plaintiffs when applying for modification consideration, b) lie to Plaintiffs regarding their eligibility for modification, c) intentionally force Plaintiffs to 33 months without determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests to Plaintiffs, e) purposefully fail to properly review Plaintiffs' requests for modification assistance, f) purposefully allow Plaintiffs' modification documents to continually expire, requiring resubmission, and employ all manner of hindering the modification process by design in order to keep Plaintiff's request for modification assistance in abeyance, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the servicing of defaulted mortgage loans.

190.     The Wells Fargo Defendants deceptively, unfairly, and fraudulently misled Plaintiffs with their offers of modification assistance, thereby inducing Plaintiffs' reliance therein and instead hindered Plaintiffs' legitimate request for modification assistance, so as to maximize servicing income and recoverable servicing expenses by keeping Plaintiffs' modification request in purposeful abeyance.

191.     The Wells Fargo senior management team, including Ben Windust, and CEOs, John Stumpf and Paul Hazen, knew the published offers of modification assistance, they had designed and approved, sent to Plaintiffs and others (and published on Wells Fargo's web-sites) were in fact false representations of Wells Fargo's true intentions when offering modification assistance to Plaintiffs and others.

192.     Plaintiffs' relied on Wells Fargo's offers of modification assistance. Rather than assist Plaintiffs, the Wells Fargo purposefully hindered their modification requests as aforementioned.

193.     Plaintiffs' accepted and acted on those offers of assistance, by applying for modification of their mortgage loan, and such reliance was reasonable. Plaintiffs' relied on these offers of assistance that they would actually be assisted with their modification request,

and further relied on the Wells Fargo Defendants' offers of assistance, to follow HAMP Guidelines when applying for modification of their mortgage loan and such reliance was to Plaintiffs' detriment as aforementioned.

194.    The senior management teams and CEO of Wells Fargo knew of the falsity of the misrepresentations made in those offers of assistance, knew those offers would induce consumer reliance, and knew that those homeowners applying for said modification assistance would be harmed by Wells Fargo's misrepresentations contained in those offers of assistance

195.    Plaintiffs were owed a reasonable duty of care, by Wells Fargo, when they offered modification assistance, to ensure that Plaintiffs were not exposed to substantial risk of loss. The Wells Fargo Defendants were negligent in that duty and breached said duty by knowingly exposing Plaintiffs to substantial risk of loss.

196.    The Wells Fargo Defendants' fraudulent misrepresentations, misconduct and negligence caused Plaintiff harm which was reasonably foreseeable.

197.    Had the Wells Fargo Defendants properly performed in reviewing Plaintiffs requests for modification, Plaintiffs would not have lost their home to foreclosure, or suffered the extreme mental and emotional distress they were subjected to during the modification application process.

198.    As a direct result of the Wells Fargo Defendants' fraudulent misrepresentations, deceitful business practices, misconduct and negligence, Plaintiffs suffered quantifiable damages such as loss of equity in their home, money spent on legal defense of foreclosure and eviction.

199.    As a direct result of the Wells Fargo Defendants' fraudulent misrepresentations, deceitful business practices, misconduct and negligence, Plaintiffs suffered general damages such as loss of property interest, negative impact to their credit rating, extreme emotional distress as the result of being hindered during their attempts at modification, their modification requests being purposefully kept in abeyance and extreme emotional distress as the result of foreclosure actions against them.

**Scott A. Webster v. Ocwen Loan Servicing, LLC**

200.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

201.     Individual and Representative Plaintiff Scott A. Webster is a citizen of Massachusetts residing at, and claims to be the rightful owner of 43 Hutchings Street, Boston, MA 02121 which is one of the subject properties referenced herein.

202.     On or about July 28, 2006, Plaintiff was granted a mortgage loan of Three Hundred Thousand and 00/100 ($300,000.00) by Taylor Bean & Whitaker Mortgage Corp. Said mortgage was recorded on August 2, 2006 in the Suffolk County Registry of Deeds in Book 40126, at page 233.

203.     On or about September - October 2006, upon information and belief, said mortgage was pooled by Trustee Defendant FHLMC, with a large number of other mortgages and sold to an as yet known and unidentified FHLMC created Trust. Taylor Bean & Whitaker originally retained the servicing rights to Plaintiffs mortgage loan, which were subsequently transferred, or sold to Saxon Mortgage and eventually to Ocwen Loan Servicing, LLC (Ocwen).

204.     On or about July 2009, Plaintiff experienced financial hardship which caused him to be unable to make him mortgage payments.

205.     On or about July, 2012, Orlans Moran, PLLC sent Plaintiff notice they had been retained by Defendant Ocwen Loan Servicing, LLC to foreclose Plaintiff's mortgage.

206.     On July 30, 2012, Ocwen sent Plaintiff an offer of assistance and HAMP application package. (Exhibit 10) In said offer of assistance, Ocwen made representations such as "We are here to help you"; and "If you need assistance, contact us immediately…"; and "Send us the information we need to help you".

207.     Plaintiff relied on these aforementioned representations contained in said offer of assistance and made an application to the Defendant Ocwen Loan Servicing, LLC, for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable

Modification Program and forwarded his request to Ocwen, which included personal financial information, tax information, and a statement attesting to his hardship on or about August 10, 2012.

208.     On August 20, 2012, Ocwen sent Plaintiff a "Relationship Manager Notice", thanking Plaintiff for "working with [Ocwen] to identify solutions for [Plaintiff's] loan" and informing Plaintiff that a specific "Relationship Manager", identified as Graves Maribel, had been assigned to monitor Plaintiff's account, and to make sure Ocwen had all critical documents so they could carefully review Plaintiff's situation. (Exhibit 11)

209.     Orlans Moran, PLLC set foreclosure auction date for Plaintiff's subject property for September 18, 2012.

210.      On August 27, 2012, Ocwen sent another offer of assistance to Plaintiff (Exhibit 12) which stated that "A foreclosure sale has been scheduled on your home but it may not be too late to save it". Said offer represented that "[Ocwen was] almost out of time, but…[Ocwen] may be able to help".

211.     Said offer also contained a representation from a purported Ocwen customer identified as H. Carrizoza of San Jacinto, CA., as follows;

> "We [Ocwen] were able to help H. Carrizoza of San Jacinto, California, who came home and saw a Notice of Sale posted on his front door. 'I panicked when I saw there was a sale scheduled in 3 weeks. I called all those numbers and places you see advertized to Save Your Home and Stop Foreclosure. They all said it was too late, the sale was scheduled and it takes at least 30 days to work out a plan. One was even charging $6,000.00 and could not guarantee they could stop it in time. I checked a recent statement from Ocwen and it had a number listed to call for help. I made the call, explained my situation and they were able to get a plan approved and out to me in four days. I signed the plan, sent it back, made the down payment and my sale was stopped the day before it was scheduled.'"

212.     Plaintiff further relied on these aforementioned representations contained in said offer of assistance and took said offer of assistance to his Attorney on September 3, 2012.

213.     Plaintiff, through his Attorney's Office, made another application to the Defendant Ocwen Loan Servicing, LLC, for consideration for his mortgage to be modified under the guidelines and supplemental directives of the U.S. Treasury Department's Making Home Affordable Home Affordable Modification Program and said application was forwarded to Ocwen, which included personal financial information, tax information, and a statement attesting to his hardship on or about September 7, 2012.

214.     On September 11, 2012, Plaintiff's Attorney's Office called Ocwen and spoke to a customer service representative who identified himself as Steven Jansburry, CSR ID # 47581. Plaintiff's Attorney's Office discussed the situation a length with Mr. Jansburry, including informing him that a foreclosure auction was pending on September 18, 2012. Mr. Jansburry informed Plaintiff's Attorney's Office that Ocwen would need another package sent over right away because there was no record that the first two packages that had been sent by Plaintiff had been received by Ocwen.

215.     On September 12, 2012, Plaintiff's Attorney's Office did forward another complete HAMP application package to Ocwen.

216.     On September 14, 2012, Plaintiff's Attorney's Office called Ocwen and spoke to a customer service representative who identified herself as Masmi. Masmi told Plaintiff's Attorney's Office that Ocwen did have all the required documents and that she would contact Orlans Moran, PLLC and postpone the foreclosure auction that had been scheduled for September 18, 2012.

217.     Plaintiff's Attorney's Office, out of an abundance of caution, contacted Ocwen on September 18, 2012, in an effort to once again confirm that the foreclosure auction of Plaintiff's property had indeed been postponed and spoke to a customer service representative who identified herself as Goodue. Goodue stated that the person handling the file was Anthony (not the assigned Relationship Manager, Graves Maribel) and then she transferred

Case 1:12-cv-12126-RWZ   Document 1   Filed 11/15/12   Page 45 of 112

the telephone call to Anthony's extension. Anthony did not pick up the call, which was subsequently answered by his voicemail, indicating that Anthony would be out of the office until September 19, 2012 and that if the call was of an emergency nature, callers should contact Benny Wood at extension 47916.

218.     Plaintiff's Attorney's Office then contacted Ocwen and attempted to reach Benny Wood at extension 47916. Mr. Wood's extension did not answer and a message was left for Mr. Wood on his voice mail.

219.     Plaintiff's Attorney's Office then called Ocwen again, this time reaching a customer service representative who identified herself as Cassandra Ilorance. Ms. Illorance stated that she would email the foreclosure department to confirm that the foreclosure auction of Plaintiff's property had in fact been cancelled. After a brief time on hold, the telephone connection was suddenly lost.

220.     Now frustrated with the lack of response from Ocwen, Plaintiff's Attorney's Office contacted Orlans Moran and spoke to a representative of that firm who identified herself as Kerri, who stated that she would try to email Ocwen to confirm if the foreclosure auction of Plaintiff's property had indeed been cancelled, because she had not been notified that it had been cancelled.

221.     Plaintiff's Attorney's Office then called Ocwen again, speaking to a customer service representative who identified himself as Deepak Verkaped, who stated the foreclosure auction of Plaintiff's subject property had been cancelled and that he would contact Orlans Moran's foreclosure department and make sure that they were informed that the Plaintiff's foreclosure auction was cancelled.

222.     In an attempt to confirm that Ocwen 's representative Deepak Verkaped had in fact contacted Orlans Moran and informed them of the cancellation of Plaintiff's foreclosure auction, Plaintiff's Attorney's office then called Kerri at Orlans Moran, who stated that she had not been informed by Ocwen that the auction had been cancelled.

223.     The Plaintiff's Attorney's Office repeatedly made calls to Ocwen and Orlans Moran, regarding the status of Plaintiff's foreclosure auction, still attempting to get a straight answer from someone, until the Plaintiff contacted his Attorney to let him know that the auctioneer was in front of his home, auctioning off the subject property.

224.     Upon hearing that the auction was taking place, Plaintiff's Attorney's Office contacted Orlans Moran and spoke to a representative who identified himself as Andrew, who informed them that Ocwen's foreclosure department had contacted them and told them to proceed with the foreclosure auction of Plaintiff's subject property, in spite of the lies that Ocwen's customer service representatives had told to Plaintiff's Attorney's Office, regarding that Plaintiff's foreclosure auction had been cancelled.

225.     Since Plaintiff first applied for the HAMP program he suffered extreme emotional and mental distress as the customer service agents of Ocwen, acting on corporate policy approved, condoned and ordered executed by the CEO and senior management executives of Ocwen, did in fact; a) falsely deny receiving documents from Plaintiff when applying for modification consideration, b) lie to Plaintiff regarding his eligibility for modification, c) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests to Plaintiff, e) purposefully fail to properly review Plaintiff's requests for modification assistance, f) purposefully lie to Plaintiff regarding the status of his foreclosure auction, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the  servicing and eventual foreclosure of defaulted mortgage loans.

226.     The Ocwen Defendant deceptively, unfairly, and fraudulently misled Plaintiff with their offers of modification assistance, thereby inducing Plaintiff's reliance therein and instead hindered Plaintiff's legitimate request for modification assistance, so as to maximize servicing income and recoverable servicing expenses by keeping Plaintiff's modification request in purposeful abeyance.

The Ocwen senior management team, and CEOs Ronald M. Faris, knew the published offers of modification assistance, they had designed and approved, sent to Plaintiff and others were

in fact false representations of Ocwen's true intentions when offering modification assistance to Plaintiff and others.

227.    Plaintiff relied on Ocwen's offers of modification assistance. Rather than assist Plaintiff, Ocwen purposefully hindered his modification requests as aforementioned.

228.    Plaintiff accepted and acted on those offers of assistance, by applying for modification of his mortgage loan, and such reliance was reasonable. Plaintiff relied on these offers of assistance that he would actually be assisted with his modification request, and further relied on Ocwen's offers of assistance, to follow HAMP Guidelines when applying for modification of his mortgage loan and such reliance was to Plaintiff's detriment as aforementioned.

229.    The senior management teams and CEO of Ocwen knew of the falsity of the misrepresentations made in those offers of assistance, knew those offers would induce consumer reliance, and knew that those homeowners applying for said modification assistance would be harmed by Ocwen's misrepresentations contained in those offers of assistance

230.    Plaintiff was owed a reasonable duty of care, by Ocwen, when they offered modification assistance, to ensure that Plaintiff was not exposed to substantial risk of loss.

203.    The Ocwen Defendant was negligent in that duty and breached said duty by knowingly exposing Plaintiff to substantial risk of loss.

231.    The Ocwen Defendant's fraudulent misrepresentations, misconduct and negligence caused Plaintiff harm which was reasonably foreseeable.

232.    Had the Ocwen Defendant properly performed in reviewing Plaintiff's requests for modification, Plaintiff would not have lost his home to foreclosure, or suffered the extreme mental and emotional distress he was subjected to during the modification application process.

233.    As a direct result of the Ocwen Defendant's fraudulent misrepresentations, deceitful business practices, misconduct and negligence, Plaintiff suffered quantifiable damages such as loss of equity in his home, money spent on legal defense of foreclosure and eviction.

47

234.     As a direct result of the Ocwen Defendant's fraudulent misrepresentations, deceitful business practices, misconduct and negligence, Plaintiff suffered general damages such as loss of property interest, negative impact to their credit rating, extreme emotional distress as the result of being hindered during their attempts at modification, their modification requests being purposefully kept in abeyance and extreme emotional distress as the result of foreclosure actions against him.

### C.     CLASS ALLEGATIONS AS TO SERVICER DEFENDANTS

235.     Plaintiffs' repeat and re-allege every allegation above as if set forth herein in full.

236.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

237.     The Plaintiffs sue on behalf of themselves and all homeowners whose loans have been serviced by the Servicer Defendants, and who, since March 5, 2009, have requested consideration and/or applied with the Servicer Defendants for a mortgage loan modification and whereby the Servicer Defendants fraudulently misrepresented, through offers of assistance, that they would in good faith review those requests, but whereby the CEOs and senior management teams of each Servicer Defendant did instead approve, condone, or allow to be executed, fraudulent corporate policies that allowed for their companies agents to; a) falsely deny receiving documents from Plaintiffs and others when applying for modification consideration, b) lie to Plaintiffs and others regarding their eligibility for modification, c) intentionally force Plaintiffs and others to wait months or years before determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests and risk of eligibility loss to Plaintiffs and others, e) purposefully fail to properly review Plaintiffs' and others requests for modification assistance, f) falsely deny eligibility when eligibility should have been granted, g) and purposefully allow Plaintiffs' and others modification documents to continually expire, requiring resubmission, h) and employ all manner of hindering the modification process by design in order to keep applicants in abeyance, in a deliberate effort to keep their mortgage

loans in a near perpetual state of default, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the servicing of defaulted mortgage loans.

238.     Plaintiffs and others relied on the Servicer Defendants' offers of modification assistance.

239.     The Servicer Defendants' fraudulently and deceitfully misled Plaintiffs and others with their offers of modification assistance and did instead hinder Plaintiffs' and others legitimate requests for modification assistance, so as to maximize servicing income and servicing expenses by keeping those modification requests in abeyance.

240.     Plaintiffs and others relied on the Servicer Defendants' offers of modification assistance. Rather than assist Plaintiffs and others, the Servicer Defendants purposefully hindered those modification requests as aforementioned.

241.     Plaintiffs and others accepted and acted on those offers of assistance, by applying for modification of their mortgage loans, and such reliance was reasonable. Plaintiffs and others relied on those offers of assistance that they would actually be assisted with their modification requests, and further relied on the Servicer Defendants' offers of assistance, to follow HAMP Guidelines (and for general modification reviews, in accordance to good servicing practices) when applying for modification of their mortgage loans and such reliance was to Plaintiffs' and others detriment as aforementioned.

242.     The senior management teams and CEOs of each Servicer Defendant knew of the falsity of the misrepresentations made in those offers of assistance, knew those offers would induce consumer reliance, and knew that those homeowners applying for said modification assistance would be harmed by each Servicer Defendant's misrepresentations contained in those offers of assistance.

243.     Plaintiffs and other borrowers were owed a reasonable duty of care, by the Servicer Defendants, when they offered modification assistance, to ensure that Plaintiffs and others were not exposed to substantial risk of loss. The Servicer Defendants' were negligent in that

duty and breached said duty by knowingly exposing Plaintiffs and others to substantial risk of loss.

244.     Had each Servicer Defendant properly performed in reviewing Plaintiffs' requests for modification, followed HAMP guidelines and its mandate to assist homeowners and prevent avoidable foreclosures as they agreed to do when executing the HAMP SPA, Plaintiffs would not have lost their homes to foreclosure, or suffered the extreme mental and emotional distress they were subjected to during the modification application process.

245.     The Servicer Defendants' negligence caused Plaintiffs and others harm which was reasonably foreseeable.

246.     The Servicer Defendants' conduct was "unfair" in that they invited and encouraged Plaintiffs and others to apply for modifications of their mortgage loans, and through the Servicer Defendants' offers of assistance, thought that their applications for modification would be reviewed in good faith.

247.     Instead, the Servicer Defendants have, in bad faith, engaged in all of the acts and omissions described herein.

248.     The Servicer Defendants' actions and practices offend public policy, and are unethical, oppressive, unscrupulous, or substantially injurious to consumers.

249.     The gravity of harm to Plaintiffs and others resulting from such unfair and deceitful acts and practices outweighs any conceivable reasons, justifications and/or motives of the Servicer Defendants for engaging in such unfair and deceptive acts and practices.

250.     The Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business.

251.     Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving and relocation expenses.

252.     Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, loss of their homes, and extreme emotional distress.

253.     Plaintiffs seek punitive damages on behalf of themselves and others so similarly situated.

254.     Plaintiffs claim on behalf of themselves and others so similarly situated that the Servicer Defendants' actions, as stated herein above, were the direct cause of the reasonably foreseeable harm they suffered. Plaintiffs and others relied on the Servicer Defendants' offers of modification assistance, and agreement with the United States Government to adhere to HAMP guidelines and directives in good faith. Plaintiffs and others accepted and acted on these offers of assistance, by applying for modification of their mortgage loans, and further relied on representations that their mortgage servicer would assist them, in good faith, by following HAMP Guidelines (and in the case of general modification applications, in accordance to good servicing practices) when applying for modification of their mortgage loans, such reliance was to their detriment, and that it is fair, just and reasonable to impose liability upon the Servicer Defendants as named herein.

255.     Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, the Defendants' current employees and current or former officers, directors, agents, representatives, their family members, the members of this Court and its staff.

256.     Plaintiffs do not know the exact size or identities of members of the Class, since such information is in the exclusive control of Defendants.  Plaintiffs believe that the Class encompasses tens or hundreds of thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the Class is so numerous that joinder of all members is impracticable.

257.     All members of the Class have been subject to and affected by the same conduct. The claims are based on standard form contracts and uniform loan modification processing

requirements.  There are questions of law and fact that are common to the Class, and

predominate over any questions affecting only individual members of the class.  These

questions include, but are not limited to the following:

a.   the nature and scope of the Servicer Defendants' fraudulent deceptions regarding their intentions to properly review Plaintiffs' and others modification requests in good faith;

b.   the nature and scope of the Servicer Defendants' fraudulent deceptions of Plaintiffs and others regarding their eligibility to obtain a modification;

c.   the nature and scope of the Servicer Defendants' fraudulent deceptions of Plaintiffs and others regarding intentionally forcing Plaintiffs and others to wait months or years before determining and communicating modification eligibility;

d.   the nature and scope of the Servicer Defendants' fraudulent deceptions of Plaintiffs and others regarding purposely failing to communicate deadlines, incompleteness of documentation, status of modification requests and risk of eligibility loss to Plaintiffs and others;

e.   the nature and scope of the Servicer Defendants' fraudulent deceptions of Plaintiffs and others regarding purposefully allowing Plaintiffs' and others modification documents to continually expire, requiring resubmission;

f.   the nature and scope of the Servicer Defendants' fraudulent deceptions of Plaintiffs and others regarding falsely denying eligibility when eligibility should have been granted;

g.   the nature and scope of the Servicer Defendants' fraudulent deceptions of Plaintiffs and others regarding employing all manner of hindering the modification process by design in order to keep applicants in abeyance, in a deliberate effort to keep their mortgage loans in a near perpetual state of

default, all as part of a well organized fraudulent scheme to increase

corporate profit through gains from the  servicing of defaulted mortgage

loans

h.     whether all Servicer Defendants' conduct in the circumstances described

herein and in the underlying complaints amounts to fraud;

i.      whether all Servicer Defendants' conduct in the circumstances described

herein and in the underlying complaints amounts to unfair, deceptive and

misleading business practices;

j.      whether all Servicer Defendants' conduct in the circumstances described

herein and in the underlying complaints violates state consumer protection

laws;

k.     whether the Servicer Defendants' conduct was negligent;

l.      whether the Court can order damages and enter injunctive relief.

258.     The claims of the Named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the class in that the Named Plaintiffs and the other members of the class were subject to the same conduct.

259.     The named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the class claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

260.     A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

261.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

262.    The Servicer Defendants acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

**D.    CAUSES OF ACTION**

<u>COUNT I</u>
**As to the Servicer Defendants**
**Fraud**

263.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

264.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

265.    The Servicer Defendants fraudulently misled Plaintiffs and others with their offers of modification assistance and did instead hinder Plaintiffs' and others legitimate requests for modification assistance, so as to maximize servicing income and servicing expenses by fraudulently and purposefully keeping those modification requests in abeyance.

266.    Plaintiffs and others relied on the Servicer Defendants' good faith offers of modification assistance. Rather than assist Plaintiffs and others, the Servicer Defendants purposefully hindered those modification requests as aforementioned.

267.    Plaintiffs and others accepted and acted on those offers of assistance, by applying for modification of their mortgage loans, and such reliance was reasonable. Plaintiffs and others relied on those offers of assistance that they would actually be assisted with their modification requests, and further relied on the Servicer Defendants' offers of assistance, to follow HAMP[2] Guidelines (and for general modification reviews, in accordance to good servicing practices) when applying for modification of their mortgage loans and such reliance was to Plaintiffs' and others detriment as aforementioned.

268.    The senior management teams and CEOs of each Servicer Defendant knew of the falsity of the misrepresentations made in those offers of assistance, knew those offers would

---

[2] Plaintiffs do not seek to state a claim asserting a private right of action under HAMP.

induce consumer reliance, and knew that those homeowners applying for said modification assistance would be harmed by each Servicer Defendant's misrepresentations contained in those offers of assistance.

269.     The Servicer Defendants' fraudulently misrepresented, through their offers of assistance, that they would in good faith review those requests but the CEOs and senior management teams of the Servicer Defendants' did instead approve, condone, or allow to be executed, fraudulent corporate policies that allowed for their companies agents to; a) falsely deny receiving documents from Plaintiffs and others when applying for modification consideration, b) lie to Plaintiffs and others regarding their eligibility for modification, c) intentionally force Plaintiffs and others to wait months or years before determining and communicating modification eligibility, d) purposely fail to communicate deadlines, incompleteness of documentation, status of modification requests and risk of eligibility loss to Plaintiffs and others, e) purposefully fail to properly review Plaintiffs' and others requests for modification assistance, f) falsely deny eligibility when eligibility should have been granted, g) and purposefully allow Plaintiffs' and others modification documents to continually expire, requiring resubmission, h) and employ all manner of hindering the modification process by design in order to keep applicants in abeyance, in a deliberate effort to keep their mortgage loans in a near perpetual state of default, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the  servicing of defaulted mortgage loans.

270.     The Servicer Defendants' conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business.

271.     The Servicer Defendants' conduct violated existing statutes, rules, regulations or laws meant for the protection of the public's health, safety or welfare.

272.     Plaintiffs and others are unsophisticated customers and could not have discovered the true nature of the material facts on their own.

273.     Plaintiffs and others were ignorant of the facts, which the Servicer Defendants' failed to disclose, and their reliance on the Servicer Defendants' offers of assistance was a substantial factor in causing them harm.

274.     Had each Servicer Defendant properly performed in reviewing Plaintiffs' requests for modification, followed HAMP guidelines and its mandate to assist homeowners and prevent avoidable foreclosures as they agreed to do when executing the HAMP SPA, Plaintiffs would not have lost their homes to foreclosure, or suffered the extreme mental and emotional distress they were subjected to during the modification application process.

275.     As a direct result of the facts the Servicer Defendants' failed to disclose, and Plaintiffs' and others reliance therein, Plaintiffs and others have suffered damages in an amount to be determined at trail.

276.     The conduct of the Servicer Defendants as mentioned above was fraudulent, and by virtue thereof Plaintiffs and others are entitled to an award of punitive damages in an amount sufficient to punish and make an example of the Servicer Defendants.

277.     As a direct result of the Servicer Defendants, fraudulent misconduct, deceitful business practices, and misrepresentations, Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving and relocation expenses.

278.     As a direct result of the Servicer Defendants, fraudulent misconduct, deceitful business practices, and misrepresentations, Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, loss of their homes, and extreme emotional and mental distress.

279.     Plaintiffs are entitled to punitive damages on behalf of themselves and others so similarly situated.

280.     Plaintiffs and others are entitled to an injunction requiring that the Servicer Defendants take all necessary steps to properly review their modification requests for consideration.

281.     Plaintiffs and others are entitled to an injunction requiring that the Servicer Defendants be prevented from foreclosure action against Plaintiffs and others, or any eviction action until such time as proper reviews of their requests for modification consideration are complete.

282.     The Plaintiffs and others are entitled to cancellation of costs and fees assessed to their accounts for wrongful foreclosure, together with additional damages.

283.     Plaintiffs and others have suffered harm and are threatened with additional harm from the Servicer Defendants' fraudulent, deceptive and unlawful practices, including the wrongful loss of a property interest for those who have suffered foreclosure.

284.     The Servicer Defendants' conduct was likely to induce reliance and to create confusion and misunderstanding.

285.     The Servicer Defendants' conduct as set forth herein is not required, permitted or authorized by any state or federal law.

286.     The Servicer Defendants' conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

287.     Plaintiffs and others are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

**COUNT II**
**As to the Servicer Defendants**
**Negligence**

288.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

289.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

290.     Plaintiffs and others relied on the Servicer Defendants' offers of modification assistance.

291.     The Servicer Defendants' fraudulently misled Plaintiffs and others with their offers

of modification assistance and did instead hinder Plaintiffs' and others legitimate requests for

modification assistance, so as to maximize servicing income and servicing expenses by

purposefully and knowingly keeping those modification requests in abeyance.

292.     Plaintiffs and others relied on the Servicer Defendants' offers of modification

assistance. Rather than assist Plaintiffs and others, the Servicer Defendants' purposefully

hindered those modification requests as aforementioned herein.

293.     The senior management teams and CEOs of each Servicer Defendant knew of the

falsity of the misrepresentations made in those offers of assistance, knew those offers would

induce consumer reliance, and knew that those homeowners applying for said modification

assistance would be harmed by each Servicer Defendant's misrepresentations contained in

those offers of assistance.

294.     Plaintiffs and others accepted and acted on those offers of assistance, by applying for

modification of their mortgage loans, and such reliance was reasonable. Plaintiffs and others

relied on those offers of assistance that they would actually be assisted with their modification

requests, and further relied on the Servicer Defendants' good faith offers of assistance, to

follow HAMP Guidelines (and for general modification reviews, in accordance to good

servicing practices) when applying for modification of their mortgage loans and such reliance

was to Plaintiffs' and others detriment as aforementioned herein.

295.     Instead of assisting Plaintiffs and others, the CEOs and senior management teams of

the Servicer Defendants' did condone, approve and cause to be executed corporate policies

that allowed their agents to: a) falsely deny receiving documents from Plaintiffs and others

when applying for modification consideration, b) lie to Plaintiffs and others regarding their

eligibility for modification, c) intentionally force Plaintiffs and others to wait months or years

before determining and communicating modification eligibility, d) purposely fail to

communicate deadlines, incompleteness of documentation, status of modification requests and

risk of eligibility loss to Plaintiffs and others, e) purposefully fail to properly review

Plaintiffs' and others requests for modification assistance, f) falsely deny eligibility when eligibility should have been granted, g) and purposefully allow Plaintiffs' and others modification documents to continually expire, requiring resubmission, h) and employ all manner of hindering the modification process by design in order to keep applicants in abeyance, in a deliberate effort to keep their mortgage loans in a near perpetual state of default, all as part of a well organized fraudulent scheme to increase corporate profit through gains from the  servicing of defaulted mortgage loans.

296.    Had each Servicer Defendant properly performed in reviewing Plaintiffs' requests for modification, followed HAMP guidelines and its mandate to assist homeowners and prevent avoidable foreclosures as they agreed to do when executing the HAMP SPA, Plaintiffs would not have lost their homes to foreclosure, or suffered the extreme mental and emotional distress they were subjected to during the modification application process.

297.    Plaintiffs and other borrowers were owed a reasonable duty of care, by the Servicer Defendants, when they offered modification assistance, to ensure that Plaintiffs and others were not exposed to substantial risk of loss. The Servicer Defendants were negligent in that duty and breached said duty by knowingly exposing Plaintiffs and others to substantial risk of loss.

298.    The Servicer Defendants negligence caused Plaintiffs and others harm which was reasonably foreseeable.

299.    As a direct result of the Servicer Defendants negligence, Plaintiffs and others have been injured.

300.    As a direct result of the Servicer Defendants negligence, Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving and relocation expenses.

301.    As a direct result of the Servicer Defendants negligence, Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, loss of their homes, and extreme emotional distress.

302.     As a direct result of the Servicer Defendants negligence, Plaintiffs are entitled to punitive damages on behalf of themselves and others so similarly situated.

303.     The Servicer Defendants conduct was likely to induce reliance and to create confusion and misunderstanding.

304.     The Servicer Defendants' conduct as set forth herein is not required, permitted or authorized by any state or federal law.

## V.   TRUSTEE DEFENDANTS

### A.     FACTS

#### i.)  General Background

305.     The Trustee Defendants negligently foreclosed (or attempted foreclosure), directly, or through the Servicer Defendants acting as nominee, on Plaintiffs' and others property, knowing that no default to the Holder of Plaintiffs' and others Notes actually existed, in violation of Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602 and §3-603.

306.     As aforementioned, in typical mortgage securitizations, mortgages are added together with other mortgages and a pool of mortgages is created. The resultant pool of mortgages is then sold to a Trust and/or REMIC which becomes the actual owner/holder of the Note and/or Mortgage.

307.     As such, the Note-holder cannot enforce the default provisions of said Note unless a default to said Note-holder exists. The Servicer Defendants and any other subsequent servicing entity of the loans in said Trusts are required to forward, from their own funds, monthly payments of principal and interest not received by the Servicer Defendants, to said Trusts. This is a standard contractual obligation of servicers, and practice in residential mortgage securitizations.

308.     Additionally, the named Plaintiffs and others gave Promissory Notes in return for being granted their mortgage loans. Those Notes are contracts between the borrower and the Holder of those Notes (Trusts). In Section 8 of all standard mortgage related Notes it is stated;

**Obligations of Persons under Note**

"…*Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note.*" [emphasis added]

When a Servicer makes delinquency advances to a Trust, they are taking over *"the[se] obligations"* contained in the Note, and by doing so they make those delinquency advance payments on the borrowers' behalf. This statement, contained in all standard mortgage related promissory notes, makes clear that Servicers' payments of borrowers' delinquent monthly obligations of principal and interest to the Trusts are on borrowers' behalf.

309.     By fulfilling their obligation to pay delinquency advances, the Servicer Defendants act as a third party making payment on behalf of defaulted borrowers to the Holders of those Mortgages and/or Notes (Trusts). As only the true Holders of those Mortgages and Notes is able to enforce the default provisions of the Notes, defaults to the true Holders of said Notes must exist in order to enact foreclosure of those mortgages.

310.     The Servicer Defendants are required, as a party with no security interest in the Plaintiffs' and others properties, Mortgages and/or Notes, to pay the principal and interest payments of those Plaintiffs' and others who have yet to remit payment (delinquency advance payments). In making delinquency advance payments, the Servicer Defendants take over the obligations of the Note given by Plaintiffs and others, and make those payments on Plaintiffs and others behalf. As such, no default to the Holders of said Notes existed (or exists) in any situation whereby foreclosure action commenced and/or was completed regarding any foreclosure whereby Plaintiffs' and others Mortgages and Notes were/are held by any Securitized Mortgage Backed Trust.

   **ii.)     Contractual Obligations among Parties in a Mortgage Securitization**

311.     Prospectus', Prospectus Supplements, the Federal Home Loan Mortgage Corporation (FHLMC) Master Trust Agreement and the Federal National Mortgage Association (FNMA)

Master Trust Agreement, which are entered as Exhibits in support of Plaintiffs' claims herein, are not contracts with mortgage servicers.

312.     In fact, the Prospectus' and Prospectus Supplements are not contracts at all. The Prospectus' and/or Prospectus Supplements are documents given to potential purchasers of the Mortgage Backed Securities (MBSs), bonds, and/or certificates being offered for sale by Trusts in much the same manner that a company going public issues a prospectus prior to the issuance of its stock on a public exchange; they are not contracts or agreements with servicers.

313.     Likewise, FHLMC, and FNMA Master Trust Agreements are also not "contracts" with anyone other than FNMA and itself, and FHLMC and itself, acting in their separate capacities as Issuer, Master Servicer, Guarantor, and Trustee.

314.     These Prospectus' and Prospectus Supplements and FNMA Master Trust Agreement have been submitted as Exhibits herein as support for the factual basis of Plaintiffs' claim, that monthly payments are made by Servicers (advances), to Trusts, of principal and interest due, but not received by Servicers, regarding the mortgage loans of Plaintiff borrowers.

315.     There exist two separate and distinct sets of contractual obligations in Prospectus' and Prospectus Supplements and the FNMA Master Trust Agreement, which are joined together in statements therein by their drafters; 1) a contract between the mortgage loan servicer and the Trust; and 2) a contract between the Trust and its bond-holders/certificate holders.

316.     In the example of a private label securitization, the actual contract that defines the rights of Trusts and the contractual obligations of mortgage servicers to Trusts is called a Pooling and Servicing Agreement (PSA).

317.     In the example of a FNMA or FHLMC established mortgage backed Trust the corresponding contract is called a Direct Servicing Contract. These actual contracts are exclusively between the servicers and the Trusts, not servicers and bond-holders.

318.     The second contract at issue is the bonds or certificates. These actual contracts are exclusively between the Trust and its bond-holders and/or certificate holders, not bond-

holders and servicers. They define the rights of the bond-holders and the contractual obligations of the Trusts to them.

319.     In Prospectus', Prospectus Supplements, and the FNMA Master Trust Agreement, the drafters of those documents merged the separate and distinct contractual obligations and rights of servicers, Trusts, and bond-holders, joining them together in clauses, including, but not limited to, clauses regarding delinquency advances.

320.     When a servicer pays a delinquency advance to a Trust, said servicer is fulfilling their contractual obligation with the Trust to do so. Plainly stated, the servicer has a contract with the Trust to make delinquency advances. The servicer does not have a contract with or contractual obligation to the bond-holders of that Trust. The contract between the servicer and the Trust is identified as either; a Pooling and Servicing agreement, or a FNMA Direct Servicing Contract, and bond-holders are not a party to either.

321.     The monthly payments paid to bond-holders are defined in a separate contract between the Trust and its bond-holders. This contract is called the bond or certificate. It is solely between the Trust and its bond-holders or certificate holders, and the servicer is not a party to it.

322.     The Servicer has a contract directly with the Trust (pooling and servicing agreement, Trust Agreement). The Servicer's obligations under that contract are solely to the Trust, not the bond-holders of the Trust, and the obligations of the Trust to its bond-holders are a separate contract (Bonds/Certificates). This is illustrated in Fig. 1 below;



**Fig. 1**
Contracts of parties to a mortgage securitization that are relevant to this Action

323.     As aforementioned, the Trusts themselves have a separate contractual obligation to pay each bond-holders their *pro rata* share of the monthly payments due on the Notes held by the Trusts, each month, according to the terms of the certificates or bonds they hold. The Notes must be considered by these parties to be paid in order for the Trust to make distributions to those bond-holders or payments due on the Notes could not possibly be distributed among bond-holders.

324.     Additionally, those payments are not returned by the bond/certificate holder after a foreclosure of a mortgage loan or "asset" of a Trust has taken place, and no recovery of delinquency advances are made directly from bond/certificate holders. Thus, once payments due and received on the Notes are distributed by the Trust to its bond/certificate holders, Notes, owned by securitized mortgage backed trusts must be considered paid.

325.     Trusts accept these delinquency advance payments as payments of the Notes, thus enabling them to make bond-holder distributions, and bond-holders accept these distributions as payments of the scheduled monthly payments of principal and interest due on Notes each month.

326.    As such the Plaintiff's and others mortgage payments (paid as delinquency advances by Servicers who had taken over Plaintiffs' and others obligations pursuant to their Notes) were in fact received by the actual Note-holders (Trusts and eventually bond-holders, with no possible direct recovery from bond-holders possible) and no enforceable defaults existed at time of foreclosures of mortgage loans owned by securitized mortgage backed trusts.

327.    Records regarding the advances made to Trusts regarding Plaintiff's and others Mortgages are held by the Servicer Defendants and the Trustee Defendants, and the information regarding the these Defendants' custodial accounts as they relate to said Trusts can be easily obtained through discovery.

328.    Moreover, it is clear that if the representations regarding delinquency advances, published in the Prospectus', Prospectus Supplements referenced herein were adhered to, the Servicer Defendants, as third party, did in fact take over (pursuant to the Note) and pay the obligations of Plaintiffs' and others so situated, to the Holders of Plaintiffs' and others Deeds of Trust and/or Notes and, as such, the Trustee Defendants and Servicer Defendants were aware that no default of said Notes existed to the Holders of Plaintiffs and others Mortgages and/or Notes at the time foreclosure action was negligently commenced and/or completed, subsequently rendering those foreclosures void.

###         iii.)    Federal National Mortgage Association - Facts

329.    In cases whereby Defendant FNMA claims to be the purported Holder of a Plaintiff's Deed of Trust and Note it is important to be familiar with said Defendant's business mechanism.

330.    FNMA buys mortgage loans (I.e. Deeds f Trusts and Notes) from approved mortgage sellers, FNMA securitizes these mortgage loans (creates and establishes Trusts that become the true Holder of the Deeds of Trust and Notes in the same fashion as the aforementioned private label mortgage backed Trusts), appoints itself as Trustee of the Trusts it creates which then sells the resultant mortgage-backed securities to investors, with FNMA's unconditional  guarantee that all of the stated principal and interest payments of the mortgage

loans held by said Trust will be timely passed through to the Trust and ultimately the

investors. Stated on page one of the Amended and Restated 2007 FNMA Single Family Trust

Agreement dated January 1, 2009 (Exhibit 13) is as follows;

> C.   Fannie Mae has purchased and intends to purchase residential mortgage loans.

> D.   Fannie Mae intends to set aside and transfer residential loans acquired by it to various Trusts established pursuant to this Trust Agreement and the related Issue Supplements and to issue guaranteed mortgage pass through certificates representing undivided beneficial ownership interest in the assets of the related Trusts.

> E.   Fannie Mae intends to guarantee to each Trust sufficient funds to permit timely distribution s to Holders of principal and interest on Certificates, a required by this Trust Agreement.

> F.   Fannie Mae intends to be the Master Servicer of the Mortgage Loans held in each Trust and to arrange for and supervise the contractual servicing of the Mortgage Loans by Direct Servicers.

> G.   Fannie Mae intends to be the Trustee for each Trust.

331.    FNMA creates Trusts, exactly like a private label securitization of mortgages, and

remains as Trustee (and Master Servicer) of each Trust. The Trusts now become the true

Holders of Notes and Mortgages of each securitization, not FNMA. As stated in the FNMA

Amended and Restated 2007 Single-Family Master Trust Agreement the Direct Servicer (i.e.

the Servicer Defendants) may be responsible for *"Delinquency Advances"* as specified in

their individual Direct Servicer Contracts with FNMA. This clause requires the Direct

Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans,

just as in Prospectus', Prospectus Supplements, and PSAs governing private label

securitizations. However, FNMA created Trusts are given the additional assurance that if for

any reason the Direct Servicer does not or is not required to forward said Delinquency

Advances, FNMA unconditionally guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust Agreement.

332.     As Defendant FNMA is a major purchaser of mortgage loans and seller of mortgage backed securities but is not required to register their Trusts and/or governing Direct Servicer Agreement's with the U.S. Securities and Exchange Commission. However, the records regarding the identities of said FNMA Trusts and the monthly payment advances regarding the Plaintiffs' and others mortgages purportedly owned, guaranteed or held by FNMA Trusts (or "FNMA Pools" as they are often referred to) are in the sole possession of Defendant FNMA and can readily be obtained through discovery.

333.     Furthermore, FNMA, acting in its capacity as Trustee of the Trusts it created, was not the owner of Plaintiffs' and others Deeds of Trust and Notes prior to foreclosure auctions and/or recording of Assignments of Deeds of Trust. FNMA merely claims ownership after purchasing said properties at auction, acting in its capacity as Trustee, on behalf of said Trusts.

334.     Moreover, FNMA established Trusts were the actual Holders of Plaintiffs' and millions of others Deeds of Trust and Notes at the time foreclosure action was initiated and concluded against them in the name of FNMA (or by Servicer Defendants acting on FNMA's behalf and/or on its instruction, which is more often the case) as the claimed Holder.

335.     Defendant FNMA, acting in its capacity as Master Servicer, forwarded to the Trusts that are/were the Holders of Plaintiffs' and others Deeds of Trust and Notes, the monthly scheduled payments of principal and interest due, as is required by FNMA's unconditional guarantee, as a third party, on behalf of Plaintiffs' and others, regardless of whether they were received by the Direct Servicer (the Servicer Defendants) or FNMA as Master Servicer. As such, the Notes of Plaintiffs' and others were not in default to the Holders of same (FNMA Trusts) at the time of foreclosure action.

336.     Trustee Defendant FNMA knew that they (or the Servicer), as third party, had in fact taken over (pursuant to the Note) and paid the obligations of the Plaintiffs' and others so

situated, to the Holders of Plaintiffs' and others Deeds of Trust and/or Notes and, as such, was aware that no default of said Notes existed to the Holders of Plaintiffs and others Mortgages and/or Notes at the time foreclosure action was negligently commenced and/or completed.

### iv.  Federal Home Loan Mortgage Corporation - Facts

337.     In cases whereby Defendant FHLMC claims to be the purported owner of a Plaintiff's Deed of Trust and Note it is important to note that said Defendant's business mechanism is almost identical to that of Defendant FNMA.

338.     FHLMC buys mortgage loans (i.e. Deeds of Trusts and Notes) from approved mortgage sellers, FHLMC securitizes mortgages loans (creates and establishes Trusts that become the true owner of the Deeds of Trust and Notes in the same fashion as FNMA), appoints itself as Trustee of the Trusts it creates which then sells the resultant mortgage-backed securities to investors, with FHLMC's unconditional  guarantee that all of the stated principal and interest payments of the mortgage loans held by said Trust will be timely passed through to the Trust and ultimately the investors. Stated on page one, section (b) of the FHLMC Pass-Through Certificates Master Trust Agreement  (Exhibit 14) is as follows;

> "(b) Freddie Mac may from time to time (i) retain, reacquire or purchase mortgage-related securities and other mortgage-related assets that are referred to herein as "assets" in accordance with the applicable provisions of the Freddie Mac act, (ii) as depositor, transfer and deposit such assets into various trust funds that are established pursuant to this agreement and that are referred to herein as "pass-through pools," (iii) as trustee, create and issue hereunder, on behalf of the related pass-through pool, mortgage-related securities representing all the beneficial interests in the assets of the related pass-through pool and otherwise act as trustee for each such pass-through pool, (iv) as guarantor, guarantee the payment of interest and principal for the benefit of the holders of such mortgage-related securities

and (v) as administrator, administer the affairs of each such pass-through pool."

339.    FHLMC creates Trusts, exactly like a private label securitization of mortgages (and FNMA), and remains as Trustee (and Master Servicer or "Administrator") of each Trust. The Trusts now become the true Holders of Notes and Deeds of Trust (i.e. the "Assets" of a FHLMC "Pass-Through Pool" as they are commonly referred, respectively) of each securitization, not FHLMC. As stated in the FHLMC Pass-Through Certificates Master Trust Agreement an asset of a FHLMC created Trust ("Pass-Through Pool") is defined as an asset transferred by the Depositor (FHLMC) to the Trustee (FHLMC) for inclusion in a Pass-Through Pool and backing the related Pass-Through Certificates (MBS).

340.    Furthermore, as stated in the FHLMC Pass-Through Certificates Master Trust Agreement, FHLMC as the Depositor, by delivering any assets pursuant to said Master Trust Agreement, unconditionally, absolutely and irrevocably transfers, assigns, sets over and otherwise conveys to the Trustee (FHLMC) of said Pass-Through Pools (FHLMC created Trusts), on behalf of the related Holders, all of Depositor's (FHLMC) right, title and interest in and to such assets, including all payments of Principal and Interest thereon received.

341.    Moreover, Defendant FHLMC guarantees to each Trust it creates, Trustee of each Trust (FHLMC) and to each Holder of a Pass-Through Certificate, timely payment of principal and interest. This guarantee is irrespective of the cash flows received from borrowers.

342.    While Defendant FHLMC's Master Trust Agreement does not reference a requirement that servicers forward delinquency advances to the trusts FHLMC creates, they do guarantee that each certificate-holder timely payment of principal and interest irrespective of the cash flows received from borrowers. This guarantees that regardless of whether or not a direct servicer was required by contract to forward delinquency advances, FHLMC Pool Notes will be paid by virtue of FHLMC's guarantee.

343.     As Defendant FHLMC is a major purchaser of mortgage loans and seller of mortgage backed securities but is not required to register it's Trusts with the U.S. Securities and Exchange Commission, the records regarding the identities of said FHLMC Trusts and the monthly payment advances regarding the Plaintiffs' and others mortgage loans purportedly owned, guaranteed or held by FHLMC Trusts (or "Pools" as they are often referred to) are in the sole possession of Defendant FHLMC and can readily be obtained through discovery.

344.     FHLMC, acting in its capacity as Trustee of the Trusts it created, was not the Holder of Plaintiffs and others Deeds of Trust and/or Notes prior to foreclosure auctions and/or recording of Assignments of Deeds of Trust. FHLMC merely claims ownership after purchasing said properties at auction, acting in its capacity as Trustee, on behalf of said Trusts.

345.     Moreover, the Plaintiffs' so named herein, and millions of other homeowners have had their mortgages foreclosed by FHLMC (or by Servicer Defendants acting on FHLMC's behalf and/or on its instruction) on a scale so enormous it is almost unfathomable.

346.     Furthermore, FHLMC established Trusts were the actual Holders of Plaintiffs' and millions of others Deeds of Trusts and Notes at the time foreclosure action was initiated and concluded against them in the name of FHLMC (or by Servicer Defendants acting on FNMA's behalf and/or on its instruction, which is more often the case) as the claimed Holder.

347.     Moreover, Defendant FHLMC, acting in its capacity as Trustee, took over Plaintiffs' and other obligations (pursuant to their Notes), and forwarded to the Trusts that are/were the Holders of Plaintiffs' and others Deeds of Trust and Notes, the monthly scheduled payments of principal and interest due, as is required by FHLMC's unconditional guarantee, as a third party, on behalf of Plaintiffs' and others, regardless of whether they were received by the Direct Servicer (the Servicer Defendants) or FHLMC as Administrator of each Trust. As such, the Notes of Plaintiffs' and others were not in default to the Holders of same (FHLMC Trusts) at the time of foreclosure action.

348.     Trustee Defendant FHLMC knew that they (or the Servicer), as third party, had in fact taken over (pursuant to the Note) and paid the obligations of the Plaintiffs' and others so situated, to the Holders of Plaintiffs' and others Deeds of Trusts and/or Notes and, as such, was aware that no default of said Notes existed to the Holders of Plaintiffs and others Deeds of Trust and/or Notes at the time foreclosure action was negligently commenced and/or completed.

### v. Servicer Defendants' Involvement in Foreclosure Process Completes their Fraud

349.     Making the Servicer Servicer Defendants' conduct even more egregious is the fact that they are the very entities carrying out said illegal foreclosure actions, as nominee for Trusts, in spite of the fact that they are often also the very entities making the delinquency advance payments to the actual Note-holders.

350.     Typically, mortgage servicers are granted the power to act as nominee for the Trustee (be it FNMA, FHLMC, or the Trustee of a private-label securitized Trust), which gives them the ability to act with complete authority and control over the foreclosure and liquidation process of the mortgages it services for Trusts.

351.     This fact is evidenced in the FNMA Master Trust Agreement, and in Prospectus Supplements of private-label securitized Trusts regarding same.

352.     Foreclosure and eviction actions are carried out, often in the name of the Servicer Defendants, acting as nominee of the Private Label Trusts, FHLMC, and/or FNMA, by the servicer.

353.     This gives the Servicer Defendants' complete control over all foreclosure, eviction and liquidation actions. As such, it is impossible for the Servicer Defendants' to be unaware that their actions regarding foreclosures are both negligent and in violation of State Uniform Commercial Code.

354.     The ability to act as nominee of the Trust in the above described capacity, rounds out the aforementioned fraudulent scheme perpetrated by the Servicer Defendants. The Servicer

Defendants offer assistance and encourage Plaintiff borrowers and others to apply for modification of their mortgage loans. The Servicer Defendants then use all manner of fraudulent tactics (as aforementioned herein) designed to hinder the modification process by keeping those Plaintiff borrowers and others defaulted mortgage loans in abeyance.  While those mortgage loans are in default, the Servicer Defendants collect servicing fees based on the principal balances of the mortgage pools they service for Trusts, which have been artificially inflated by keeping Plaintiff borrowers and others defaulted mortgage loans in abeyance through the fraudulent hindrance of their application for modifications. The Servicer Defendants, having complete control over the loss mitigation, foreclosure and liquidation processes, waits to foreclose on the defaulted mortgage loans of Plaintiff borrowers and others, until the amount of advances has reached the point whereby they can recover the maximum amount of money from liquidation proceeds based on the Servicer Defendants' estimates of liquidation price. When the Servicer Defendants feel they have squeezed every dime they can out of a defaulted mortgage loan, they then foreclose, liquidate, and recover their money advanced, their profit from interest on those advances, and their illicit "padding" (as aforementioned) of advanced servicing expenses.

355.     The Servicer Defendants are aware of the payments they have made to the actual Note Holders with respect to advances of delinquent monthly mortgage payments of Plaintiffs and others, to mortgage backed trusts.

356.     As such, the Servicer Defendants are aware that Note-holders receiving payment of delinquent monthly mortgage payments of Plaintiffs and others, in the form of delinquency advances constituted payment of those Notes

357.     The Servicer Defendants' handle all foreclosure, eviction and liquidation of Plaintiffs' and others mortgage loans and property, having the full knowledge that all those actions are in fact preceded by a violation of State Uniform Commercial Code and are simultaneously negligent.

### vi.    Summary

358.    During this entire foreclosure crisis, the Servicer and Trustee Defendants have tried to keep the knowledge of their contractual obligations to each other, and their complex interactions and relationships out of public knowledge, for fear of being found that many of their practices are willfully, knowingly and purposefully designed to flaunt and violate laws as if they were of no consequence, all in a precise, well organized effort to reap billions of dollars in illicit profits for their respective firms while financially, mentally and emotionally damaging the Plaintiffs and others, and severely damaging the economic wellbeing of this Nation as a whole.

359.    The actions of the Servicer and Trustee Defendants, in foreclosing, directly or through the Servicer Defendants as nominee, the mortgage loans of Plaintiffs and others, is in violation of Massachusetts Uniform Commercial Code as those Notes, joined to said mortgage loans, given by Plaintiffs and others, were not in default, due to the Servicer Defendants and/or FNMA, or FHLMC, as Trustee, taking over the obligations of the Plaintiffs and others (pursuant to those Notes) and paying those obligations to the true holders of those Notes.

360.    Plaintiffs and others were harmed by the Servicer and Trustee Defendants' violation of Massachusetts Uniform Commercial Code in that they were foreclosed upon or foreclosure was attempted illegally, suffered the wrongful loss of property, suffered eviction from their homes, their credit ratings were damaged, incurred legal expenses related to bankruptcy, foreclosure and eviction defense, incurred moving and storage expenses, and were the subject of extreme emotional and mental distress.

361.    Plaintiffs and others have standing to make their claims for violation of Massachusetts Uniform Commercial Code in that they are parties to contracts, through those Notes, given in exchange for their mortgage loans, to their lender which were subsequently purchased and held by the various Trusts as noted herein.

362.     The Servicer and Trustee Defendants violated Massachusetts Uniform Commercial Code in that they knowingly took the actions described herein, acting on behalf of those Trusts.

363.     The Servicer and Trustee Defendants were negligent in their duty of care in their actions as stated herein.

364.     The Servicer and Trustee Defendants owed Plaintiffs and others reasonable duties of care as the servicers of their mortgage loans, and as Trustees of the Trusts that owned Plaintiffs and others Notes, to not illegally attempt to foreclose, or complete foreclosure on their mortgage loans and subsequently evict them from their rightful property.

365.     Plaintiffs and others relied on the Servicer and Trustee Defendants' duties of care owed to them and were instead knowingly exposed to substantial risk of loss, by being illegally threatened with foreclosure, foreclosed upon, and evicted from their rightful property.

366.     The Servicer and Trustee Defendants' knowingly illegally foreclosed the mortgage loans of Plaintiffs and others and it was reasonably foreseeable that those actions would be the direct cause of the harm suffered by Plaintiffs and others.

367.     The Servicer and Trustee Defendants' knew they had, taken over Plaintiffs and others monthly mortgage obligations, pursuant to their Notes, and made delinquency advance payments to the Trusts that owned Plaintiffs and others Mortgages.

368.     The Servicer and Trustee Defendants' then foreclosed on Plaintiffs and others , knowing their Notes were not in default, exposing them to significant risk of loss.

369.     Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, loss of property interest, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving, storage and relocation expenses.

370.     Plaintiffs and others have suffered general damages such as negative impact to credit ratings, extreme mental and emotional distress as the result of being threatened with foreclosure, and eventual loss of their homes.

**B.     NAMED PLAINTIFFS' FACTS & ALLEGATIONS**

**Timothy P. Mooney & Susan Mooney v. Federal Home Loan Mortgage Corporation and**

**Wells Fargo Bank, N.A.**

371.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

372.     Plaintiff Timothy P. Mooney & Susan Mooney are citizens of the State of

Massachusetts residing at, and claim to be the rightful owners of 43 South Street, Kingston,

MA 02364, which is the subject property incorporated and referred to herein.

373.     On or about June 11, 1999, Plaintiffs gave a first Mortgage and Note to Fleet

Mortgage Corp. in the original principal amount of $154,000.00, secured by said subject

property. Said mortgages were recorded in the Plymouth County Registry of Deeds, on June

16, 1999, in Book 17565, at Page 334.

374.     On or about July – August of 1999, Plaintiffs' mortgage loan was sold to a Federal

Home Loan Mortgage Corporation (FHLMC) sponsored (created) mortgage backed trust or

"Pool".

375.     The servicing rights to Plaintiffs' mortgage loan subsequently became to be serviced

by Washington Mutual, as successor by merger to Fleet, and eventually by Servicer Defendant

Wells Fargo Bank, N.A. (Wells Fargo), via assignment from Washington Mutual.

376.     On or about January 2010, Plaintiffs experienced financial hardship which caused

them to be unable to make their mortgage payments.

377.     On August 29, 2012, Harmon Law sent Plaintiffs Notice of Mortgage Foreclosure

Sale, having been retained by Defendant Wells Fargo Bank, N. A. (acting on behalf of

FHLMC as their nominee) to foreclose Plaintiffs' mortgage, while Plaintiffs were being

considered for HAMP eligibility.

378.     On or about October 3, 2011, a private party purchased Plaintiffs' subject property at

said mortgage foreclosure auction.

379.     As stated in the FHLMC Pass-Through Certificates Master Trust Agreement

(Exhibit 14) an asset of a FHLMC created Trust ("Pass-Through Pool") is defined as an asset

transferred by the Depositor (FHLMC) to the Trustee (FHLMC) for inclusion in a Pass-Through Pool and backing the related Pass-Through Certificates (MBS).

380.    Furthermore, as stated in the FHLMC Pass-Through Certificates Master Trust Agreement, FHLMC as the Depositor, by delivering any assets pursuant to said Master Trust Agreement, unconditionally, absolutely and irrevocably transfers, assigns, sets over and otherwise conveys to the Trustee (FHLMC) of said Pass-Through Pools (FHLMC created Trusts), on behalf of the related Holders, all of Depositor's (FHLMC) right, title and interest in and to such assets, including all payments of Principal and Interest thereon received.

381.    Defendant FHLMC guarantees to each Trust it creates, Trustee of each Trust (FHLMC) and to each Holder of a Pass-Through Certificate, timely payment of principal and interest. This guarantee is irrespective of the cash flows received from borrowers.

382.    Plaintiffs' allege that the Wells Fargo Servicer Defendants or FHLMC (by virtue of their guarantee) had in fact taken over their payment obligations, pursuant to Section 8 of the Note Plaintiffs' gave in return for said mortgage loan, and Wells Fargo or FHLMC did make all of the payments due thereunder, to the Note Holder, to the true owner of Plaintiffs' Note and Mortgage, an as yet accurately indentified FHLMC mortgage backed Trust or "Pool", as is stated as being required in the FHLMC Pass-Through Certificates Master Trust Agreement, evidenced herein, regarding said mortgage backed Trust. As such the Note was not in default at the time foreclosure action was commenced and/or completed.

383.    As such, said foreclosure was illegal and void, as no default existed to the Holder of Note and/or Mortgage at time of the aforementioned foreclosure actions

384.    The Plaintiffs' Mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale could not have been legally exercised

385.    Plaintiffs' allege that said foreclosure action was illegal as no default existed to Holder of their Note due to the third party servicer's (Wells Fargo) and/or Administrator and/or Trustee FHLMC's payment (by virtue of their guarantee) of their mortgage obligation

to the Holder of their Note and Mortgage (the as yet identified FHLMC Trust) as required under the FHLMC Master Trust Agreement regarding said mortgage obligation.

386.    As no default of the Note existed to said, as yet unidentified, FHLMC sponsored mortgage backed Trust, which was the lawful owner of Plaintiffs' Mortgage and Note, the foreclosure and foreclosure proceedings were invalid.

387.    The records regarding the direct servicing contract among the parties and principal and interest payments to said FHLMC sponsored mortgage backed Trust, regarding Plaintiffs' mortgage obligation, are in the control of Defendant FHLMC, and this information can readily be obtained through discovery. However, if the terms of FHLMC's Master Trust Agreement were adhered to, it is clear that no default of Plaintiffs' Note existed at time foreclosure action was commenced and/or completed.

388.    The Defendants' violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in attempting the foreclosure actions stated herein, as Plaintiff's Note was not in default, due to the Defendants Wells Fargo and/or FHLMC taking over the obligations of the Plaintiffs (pursuant to their Note) and paying those obligations to the true holder of their Note.

389.    The Defendants' owed Plaintiffs a reasonable duty of care to not attempt or complete foreclosure actions against them that were illegal. Defendants instead knowingly exposed Plaintiffs to substantial risk of loss, by illegally threatening them with foreclosure. As such, said Defendants breached those reasonable duties of care owed to Plaintiffs. Plaintiffs relied on the Defendants' duty of care and such reliance was reasonable.

390.    The Defendants knew of the falsity of the default status of Plaintiffs Note, yet foreclosed Plaintiffs mortgage anyway.

391.    The Defendants' negligence caused Plaintiffs harm which was reasonably foreseeable.

392.    The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiffs.

393.    As a direct result of Defendants' violations of law and negligence, Plaintiffs suffered loss of property interest, loss of equity in their rightful property, will subsequently be subject to an eviction action and threatened with the loss of their home, significant damage to their credit ratings, significant legal costs in defense of foreclosure and eviction, and severe and extreme emotional and mental distress.

**Kim Chounsvathmao v. BAC Home Loans Servicing, LP, Bank of America, N. A. & Federal National Mortgage Association**

394.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

395.    Individual and Representative Plaintiff Kim Chounsvathmao is a citizen of Massachusetts residing at, and claims to be the rightful owner of 9 Rockland Street, Lynn, MA 01902 which is one of the subject properties referenced herein.

396.    On or about October 20, 2005, Plaintiff was given a mortgage loan of Two Hundred Thirty One Thousand and 00/100 ($231,000.00) by Virtual Bank, a division of Lydian Private Bank. Said mortgage was recorded on October 27, 2005 in the Essex County South Registry of Deeds in Book 25003, at page 128.

397.    On or about October - November 2005, upon information and belief, said mortgage was pooled by Trustee Defendant FNMA, with a large number of other mortgages and sold to an as yet known and unidentified FNMA created Trust.

398.    Sometime after executing said Note and Deed of Trust, Countrywide Home Loans obtained the servicing rights to Plaintiff's mortgage loan and subsequently was serviced by Servicer Defendant BAC Home Loans Servicing, LP, as successor in interest to Countrywide.

399.    Upon information and belief, the servicing of the Mortgage, and the Note given by Plaintiff was, from no later than November 2005, governed by a FNMA Master Trust Agreement and her mortgage payments were unconditionally guaranteed, by FNMA, to said Trust, as specified in said Trust Agreement.

400.    In 2007, Defendant Bank of America commenced negotiations to acquire Countrywide Home Loans, Inc. and Countrywide Financial Corporation (hereinafter referred

to as "Countrywide").  By late 2007, Bank of America, N.A. began merging its operations with Countrywide and adopting some of Countrywide's practices.  From and after its acquisition of Countrywide in July 2008 and continuing to the present, both as a successor in interest to Countrywide and as a principal, Bank of America, N.A., by and through its wholly owned subsidiary BAC Home Loans Servicing, LP, became the servicer of Plaintiff's mortgage loan.

On or about December of 2009, Plaintiff began to have difficulty maintaining her mortgage payments on said mortgage loan.

401.     On or about July 2009, Plaintiff experienced financial hardship which caused her to be unable to make her mortgage payments.

402.     On or about June 20, 2011, BAC Home Loans Servicing, LP, held an auction to foreclose Plaintiff's Mortgage secured by said subject property. Said property was purchased by FNMA, upon information and belief, acting as Trustee for said as yet accurately identified FNMA established Mortgage Backed Trust, which was the lawful Holder of Plaintiff's Mortgage and Note at the time of said auction.

403.     Plaintiff alleges that either FNMA or the BOA Servicer Defendants had in fact taken over her payment obligations, pursuant to Section 8 of the Note Plaintiff gave in return for said mortgage loan, and either FNMA or the BOA Servicer Defendants did make all of the payments due thereunder, to the Note Holder, said as yet identified FNMA mortgage backed Trust, and as such the Note was not in default at the time foreclosure action was commenced and/or completed.

404.     As such, said foreclosure was illegal and void as no default existed to the Holder of Note and/or Deed of Trust at time of the aforementioned foreclosure actions.

405.     As stated in the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 13) the Direct Servicer (i.e. the Servicer Defendant BOA) may be responsible for *"Delinquency Advances"* as specified in their individual Direct Servicer

Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans.

406.     Furthermore, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not or is not required to forward said Delinquency Advances, FNMA unconditionally guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust.

407.     The Plaintiff's Mortgage provides for a Statutory Power of Sale in the event of a default of the Note. However, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale could not have legally been exercised.

408.     As no default of the Note existed to said, as yet unidentified, FNMA sponsored mortgage backed Trust, which was the lawful owner of Plaintiff's Mortgage and Note, the foreclosure and foreclosure proceedings are/were invalid.

409.     The records regarding the direct servicing agreement among the parties and principal and interest payments to the FNMA sponsored mortgage backed Trust, regarding Plaintiff's mortgage, are in the control of Defendant FNMA, and this information can readily be obtained through discovery. However, if the terms of FNMA's Master Trust Agreement were adhered to, it is clear that no default of Plaintiff's Note existed at time foreclosure action was commenced and/or completed.

410.     The Defendants' violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in attempting the foreclosure actions stated herein, as Plaintiff's Note was not in default, due to BOA Servicer Defendants and/or FNMA taking over the obligations of the Plaintiff (pursuant to her Note) and paying those obligations to the true holder of her Note.

411.     The Defendants' owed Plaintiff a reasonable duty of care to not attempt or complete foreclosure actions against her that were illegal. Defendants instead knowingly exposed Plaintiff to substantial risk of loss, by illegally threatening her with and completing foreclosure and subsequent eviction actions. As such, said Defendants breached those

reasonable duties of care owed to Plaintiff. Plaintiff relied on the Defendants' duty of care and such reliance was reasonable.

412.     The Defendants knew of the falsity of the default status of Plaintiff's Note, yet foreclosed Plaintiffs mortgage anyway.

413.     The Defendants' negligence directly caused Plaintiff harm which was reasonably foreseeable.

414.     The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiff.

415.     As a direct result of the Defendants' violations of law and negligence, Plaintiff suffered loss of property interest, loss of equity, significant damage to her credit rating, costs associated with legal defense of foreclosure and eviction, and severe and extreme emotional and mental distress.

### James B. & Tammy E. Colbert v. Deutsche Bank National Trust Company, Wells Fargo Bank, N.A. & America's Servicing Company

416.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

417.     Plaintiff James B. & Tammy E. Colbert are citizens of the State of Massachusetts residing at, and claim to be the rightful owners of 8 Evergreen Road, Plainville, MA 02762, which is the subject property incorporated and referred to herein.

418.     On March 13, 2006, Plaintiffs gave a first Mortgage and Note to WMC Mortgage Corp. in the original principal amount of $224,000.00, secured by said subject property. Said mortgages were recorded in the Norfolk County Registry of Deeds, in Book 23478, at page 315.

419.     A short time after being granted said mortgage loan, Wells Fargo Bank, N.A. was granted servicing rights to Plaintiff's mortgage loan which subsequently became to be serviced by Servicer Defendant Americas Servicing Company (ASC), a wholly owned subsidiary of Wells Fargo Bank, N.A.

420.     However, unknown to Plaintiffs at the time, on or about April - May 2006 WMC Mortgage Corp. pooled and sold Plaintiffs' Note and Mortgage to the Morgan Stanley ABS Capital I, Inc. Trust 2006-WMC2 (Trust). Deutsche Bank National Trust Company (Deutsche Bank) was appointed Trustee of said Trust.

421.     On or about November 2009, Plaintiffs experienced financial hardship which caused them to be unable to make their mortgage payments.

422.     On May 15, 2012, Harmon Law Offices, P.C. sent Plaintiffs Notice of Mortgage Foreclosure Sale, having been retained by Defendant Deutsche Bank to foreclose Plaintiffs' mortgage.

423.     Harmon Law Offices, P.C. set foreclosure auction date for June 14, 2012. On or about June 14, 2012, Deutsche Bank purchased Plaintiffs' subject property at public auction, in its capacity as Trustee for the Morgan Stanley ABS Capital I, Inc. Trust 2006-WMC2.

424.     Plaintiffs' allege that the Wells Fargo Defendants had in fact taken over their payment obligations, pursuant to Section 8 of the Note Plaintiffs' gave in return for said mortgage loan, and Wells Fargo did make all of the payments due thereunder, to the Note Holder, and true owner of Plaintiffs' Note and Mortgage, the Morgan Stanley ABS Capital I, Inc. Trust 2006-WMC2, as is stated as being required of Wells Fargo in the Prospectus Supplement, evidenced herein, regarding said mortgage backed Trust (Exhibit 15 - *Id. at pp. 13 "Advances"*). As such the Note was not in default at the time foreclosure action was commenced.

425.     As such, said foreclosure actions were illegal and void, as no default existed to the Holder of Note and/or Mortgage at time of the aforementioned foreclosure actions.

426.     As no default of the Note existed to said Trust, which was the lawful owner of said mortgage loan and Note, the foreclosure proceedings were invalid.

427.     The Plaintiffs' Mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale could not have been legally exercised.

428.    Plaintiffs allege that said foreclosure actions were illegal as no default existed to Holder of their Note, due to the third party servicer's (Wells Fargo) payment of their mortgage obligation to the Holder of their Mortgage and Note (Morgan Stanley ABS Capital I, Inc. Trust 2006-WMC2) as required under the pooling and servicing agreement governing said Trust which was the Holder of said Mortgage and Note.

429.    The records regarding the payments of principal and interest made to said Trust, are in the sole possession of the Wells Fargo servicer Defendant and the Deutsche Bank Trustee Defendant, and can readily be obtained through discovery. However, if the published statements of the Prospectus/Prospectus Supplement (as evidenced herein) were adhered to, it is clear that no default of Plaintiffs' Note existed at time foreclosure action was commenced.

430.    The Defendants' violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in attempting the foreclosure actions stated herein, as Plaintiffs' Note was not in default, due to the Defendant Wells Fargo taking over the obligations of the Plaintiffs (pursuant to their Note) and paying those obligations to the true holder of their Note.

431.    Defendant Wells Fargo owed Plaintiffs a direct reasonable duty of care, as Servicer of their mortgage loan, to not attempt or complete foreclosure actions against Plaintiffs that were illegal. Wells Fargo knew Plaintiffs' monthly mortgage obligations had been paid and initiated said foreclosure actions acting as nominee of Deutsche Bank.

432.    Defendants instead knowingly exposed Plaintiffs to substantial risk of loss, by illegally and negligently foreclosing their mortgage loan and selling at auction their rightful property. As such, said Defendants breached those reasonable duties of care owed to Plaintiffs.

433.    Plaintiffs' relied on the Defendants' duty of care and such reliance was reasonable.

434.    The Defendants' knew of the falsity if the default status of Plaintiffs' Note, yet foreclosed Plaintiffs mortgage anyway.

435.    Defendant Deutsche Bank owed Plaintiffs a direct reasonable duty of care to not attempt or complete foreclosure actions against them that were illegal. Defendants instead knowingly exposed Plaintiffs to substantial risk of loss, by illegally and negligently allowing Wells Fargo, acting in Deutsche Bank's name, as nominee, to threaten Plaintiffs foreclose Plaintiffs' mortgage.

436.    As such, said Defendants breached those reasonable duties of care owed to Plaintiffs. Plaintiffs relied on the Defendants' duty of care and such reliance was reasonable.

437.    The Defendants' negligence caused Plaintiffs harm which was reasonably foreseeable.

438.    The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiffs.

439.    As a direct result of Defendants' violations of law and negligence, Plaintiffs suffered significant damage to their credit ratings, significant legal costs in defense of foreclosure and eviction, and severe and extreme emotional and mental distress as the result of remaining under the constant threat of eviction, and the potential of losing their home.

**Mary Kyeng Kao (a.k.a. Kyeng Kao) & Somnang El v. GMAC Mortgage, LLC. &**
**Federal Home Loan Mortgage Corporation**

440.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

441.    Plaintiffs Mary Kyeng Kao (a.k.a. Kyeng Kao) and Somnang El are citizens of the State of Massachusetts residing at and the rightful owners of 11 Brickett Street, Lowell, MA 01851, which is one of the subject properties incorporated and referred to herein.

442.    On January 13, 2006, Plaintiffs gave a first Mortgage and Note to Homecomings Financial Network, Inc. in the original principal amount of $218,000.00, secured by said subject property. Said mortgage was recorded in the Middlesex North County Registry of Deeds, on January 19, 2006 in Book 19741, at page 246.

443.    Sometime after being granted said mortgage loan, GMAC Mortgage, LLC, parent company of Homecomings, became the servicer of Plaintiffs' mortgage loan.

444.     On or about February 7, 2006 Plaintiffs' Mortgage and Note was pooled and sold to

a Federal Home Loan Mortgage Corporation (FHLMC) sponsored (created) Trust or "Pool".

445.     On or about January 2011, Plaintiffs experienced financial hardship which caused

them to be unable to make their mortgage payments.

446.     On September 21, 2012, Orlans Moran, PLLC sent Plaintiffs notice they had been

retained by Defendant GMAC Mortgage, LLC to foreclose Plaintiffs' mortgage.

447.     Orlans Moran, PLLC subsequently set foreclosure auction date for Plaintiffs subject

property for October 17, 2012, which was postponed to December 17, 2012. Plaintiffs

currently live under the threat of imminent foreclosure.

448.     As stated in the FHLMC Pass-Through Certificates Master Trust Agreement

(Exhibit 14) an asset of a FHLMC created Trust ("Pass-Through Pool") is defined as an asset

transferred by the Depositor (FHLMC) to the Trustee (FHLMC) for inclusion in a Pass-

Through Pool and backing the related Pass-Through Certificates (MBS).

449.     Furthermore, as stated in the FHLMC Pass-Through Certificates Master Trust

Agreement, FHLMC as the Depositor, by delivering any assets pursuant to said Master Trust

Agreement, unconditionally, absolutely and irrevocably transfers, assigns, sets over and

otherwise conveys to the Trustee (FHLMC) of said Pass-Through Pools (FHLMC created

Trusts), on behalf of the related Holders, all of Depositor's (FHLMC) right, title and interest

in and to such assets, including all payments of Principal and Interest thereon received.

450.     Defendant FHLMC guarantees to each Trust it creates, Trustee of each Trust

(FHLMC) and to each Holder of a Pass-Through Certificate, timely payment of principal and

interest. This guarantee is irrespective of the cash flows received from borrowers.

451.     Plaintiffs' allege that the GMAC Servicer Defendant or FHLMC (by virtue of their

guarantee) had in fact taken over their payment obligations, pursuant to Section 8 of the Note

Plaintiffs' gave in return for said mortgage loan, and GMAC or FHLMC did make all of the

payments due thereunder, to the Note Holder, to the true owner of Plaintiffs' Note and

Mortgage, an as yet accurately indentified FHLMC mortgage backed Trust or "Pool", as is

stated as being required in the FHLMC Pass-Through Certificates Master Trust Agreement, evidenced herein, regarding said mortgage backed Trust. As such the Note is not in default now, at the time foreclosure action was commenced, or while it continues.

452.    As such, said foreclosure actions are illegal and void, as no default existed to the Holder of Note and/or Mortgage at time of the aforementioned foreclosure actions.

453.    The Plaintiffs' Mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot be legally exercised

454.    Plaintiffs' allege that said foreclosure action is illegal as no default exists to Holder of their Note due to the third party servicer's (GMAC) and/or Administrator and/or Trustee FHLMC's payment (by virtue of their guarantee) of their mortgage obligation to the Holder of their Note and Mortgage (the as yet identified FHLMC Trust) as required under the FHLMC Master Trust Agreement regarding said mortgage obligation.

455.    As no default of the Note exists to said, as yet unidentified, FHLMC sponsored mortgage backed Trust, which is the lawful owner of Plaintiffs' Mortgage and Note, the foreclosure proceedings are invalid.

456.    The records regarding the direct servicing contract among the parties and principal and interest payments to said FHLMC sponsored mortgage backed Trust, regarding Plaintiffs' mortgage obligation, are in the control of Defendant FHLMC, and this information can readily be obtained through discovery. However, if the terms of FHLMC's Master Trust Agreement were adhered to, it is clear that no default of Plaintiffs' Note now exists or existed at time foreclosure actions were commenced.

457.    The Defendants' violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in attempting the foreclosure actions stated herein, as Plaintiff's Note is not in default, due to the Defendants GMAC and/or FHLMC taking over the obligations of the Plaintiffs (pursuant to their Note) and paying those obligations to the true holder of their Note.

458.     The Defendants' owed Plaintiffs a reasonable duty of care to not attempt foreclosure actions against them that are illegal. Defendants instead knowingly exposed Plaintiffs to substantial risk of loss, by illegally threatening them with foreclosure. As such, said Defendants breached those reasonable duties of care owed to Plaintiffs. Plaintiffs relied on the Defendants' duty of care and such reliance was reasonable.

459.     The Defendants knew of the falsity of the default status of Plaintiffs' Note, yet proceeded with foreclosure actions against Plaintiffs' mortgage anyway.

460.     The Defendants' negligence caused Plaintiffs harm which was reasonably foreseeable.

461.     The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiffs.

462.     As a direct result of Defendants' violations of law and negligence, Plaintiffs are threatened with the loss of their home and property interest, have suffered significant damage to their credit ratings, significant legal costs in defense of foreclosure and potential eviction, and severe and extreme emotional and mental distress.

**Russell B. Little v. Citimortgage, Inc. & Federal National Mortgage Association**

463.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

464.     Individual and Representative Plaintiff Russell B. Little is a citizen of Massachusetts residing at, and claims to be the rightful owner of 52 Sunset Boulevard, East Wareham,, MA 02538 which is one of the subject properties referenced herein.

465.     On or about August 21, 2008, Plaintiff was given a mortgage loan of One Hundred Fifty Thousand and 00/100 ($150,000.00) by New England Regional Mortgage Corporation, LLC. Said mortgage was recorded on August 26, 2008 in the Plymouth County Registry of Deeds in Book 36304, at page 126.

466.     On or about September - October 2005, upon information and belief, said mortgage was pooled by Trustee Defendant FNMA, with a large number of other mortgages and sold to an as yet known and unidentified FNMA created Trust.

467.     Sometime after executing said Note and Deed of Trust, Citimortgage, Inc. obtained the servicing rights to Plaintiff's mortgage loan.

468.     Upon information and belief, the servicing of the Mortgage, and the Note given by Plaintiff was, from no later than October 2005, governed by a FNMA Master Trust Agreement and his mortgage payments were unconditionally guaranteed, by FNMA, to said Trust, as specified in said Trust Agreement.

469.     On or about July 2009, Plaintiff experienced financial hardship which caused him to be unable to make his mortgage payments.

470.     On or about November 18, 2011, Citimortgage, Inc., held an auction to foreclose Plaintiff's Mortgage secured by said subject property. Said property was purchased by Citimortgage, Inc., upon information and belief, acting as nominee for FNMA, as Trustee of an as yet accurately identified FNMA established Mortgage Backed Trust, which was the lawful Holder of Plaintiff's Mortgage and Note at the time of said auction.

471.     Plaintiff alleges that either FNMA or the Citimortgage Servicer Defendant had in fact taken over his payment obligations, pursuant to Section 8 of the Note Plaintiff gave in return for said mortgage loan, and either FNMA or the Citimortgage Servicer Defendant did make all of the payments due thereunder, to the Note Holder, said as yet identified FNMA mortgage backed Trust, and as such the Note was not in default at the time foreclosure action was commenced and/or completed.

472.     As such, said foreclosure was illegal and void as no default existed to the Holder of Note and/or Deed of Trust at time of the aforementioned foreclosure actions.

473.     As stated in the FNMA Amended and Restated 2007 Single-Family Master Trust Agreement (Exhibit 13) the Direct Servicer (i.e. the Servicer Defendant Citimortgage) may be responsible for *"Delinquency Advances"* as specified in their individual Direct Servicer Contracts with FNMA. This clause requires the Direct Servicer (or Sub-Servicer, if applicable) to advance payment on any non-performing loans.

474.     Furthermore, FNMA created Trusts are given the additional assurance that if for any reason the Direct Servicer does not or is not required to forward said Delinquency Advances, FNMA unconditionally guarantees that it will forward said Delinquency Advances to the Trusts it created as stated in said Master Trust.

475.     The Plaintiff's Mortgage provides for a Statutory Power of Sale in the event of a default of the Note. However, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale could not have legally been exercised.

476.     As no default of the Note existed to said, as yet unidentified, FNMA sponsored mortgage backed Trust, which was the lawful owner of Plaintiff's Mortgage and Note, the foreclosure and foreclosure proceedings are/were invalid.

477.     The records regarding the direct servicing agreement among the parties and principal and interest payments to the FNMA sponsored mortgage backed Trust, regarding Plaintiff's mortgage, are in the control of Defendant FNMA, and this information can readily be obtained through discovery. However, if the terms of FNMA's Master Trust Agreement were adhered to, it is clear that no default of Plaintiff's Note existed at time foreclosure action was commenced and/or completed.

478.     The Defendants' violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in attempting the foreclosure actions stated herein, as Plaintiff's Note was not in default, due to Citimortgage and/or FNMA taking over the obligations of the Plaintiff (pursuant to his Note) and paying those obligations to the true holder of her Note.

479.     The Defendants' owed Plaintiff a reasonable duty of care to not attempt or complete foreclosure actions against her that were illegal. Defendants instead knowingly exposed Plaintiff to substantial risk of loss, by illegally threatening him with and completing foreclosure and subsequent eviction actions. As such, said Defendants breached those reasonable duties of care owed to Plaintiff. Plaintiff relied on the Defendants' duty of care and such reliance was reasonable.

480.    The Defendants knew of the falsity of the default status of Plaintiff's Note, yet foreclosed Plaintiffs mortgage anyway.

481.    The Defendants' negligence directly caused Plaintiff harm which was reasonably foreseeable.

482.    The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiff.

483.    As a direct result of the Defendants' violations of law and negligence, Plaintiff suffered loss of property interest, loss of equity, significant damage to his credit rating, costs associated with legal defense of foreclosure and eviction, and severe and extreme emotional and mental distress.

**Efrain Cartagena & Elizabeth Alvarez v. Vericrest Financial, Inc. & U.S. Bank, N. A.**

484.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

485.    Individual and Representative Plaintiff Efrain Cartagena is a citizen of Massachusetts residing at 473 Chestnut Hill Road, Millville, MA 01529 and claims to be one of the rightful owners of 161 Beaver Street, Framingham, MA 01702 which is one of the subject properties referenced herein.

486.    Individual and Representative Plaintiff Elizabeth Alvarez is a citizen of Massachusetts residing at 473 Chestnut Hill Road, Millville, MA 01529 and claims to be one of the rightful owners of 161 Beaver Street, Framingham, MA 01702 which is one of the subject properties referenced herein.

487.    On or about June 11, 2007, Plaintiff was given a mortgage loan of Three Hundred Thirty Three Thousand and 00/100 ($333,000.00) by Wilmington Finance, Inc. Said mortgage was recorded on June 29, 2007 in the Middlesex County South Registry of Deeds in Book 49693, at page 197.

488.    On or about July - August 2007, upon information and belief, said mortgage was pooled with a large number of other mortgages and sold to an as yet known and accurately identified private label mortgage backed Trust.

489.     Plaintiffs allege this pooling and sale of their mortgage loan and Note was hidden from them through the use of Mortgage Electronic Registration Systems, Inc. (MERS) to conceal transfer of ownership of said mortgage loan and Note to said Trust.

490.     In July 2007, the servicing of Plaintiffs mortgage loan was transferred to CIT Group Sales Financing, Inc. (CIT), the home lending division of the CIT Group. CIT was subsequently purchased in 2008 by Lone Star Funds, a private equity firm, often referred to as a "vulture fund", notorious for purchasing defaulted assets of mortgage backed Trusts, and other defaulted or distressed assets of various banks and companies around the globe, and profiting by the liquidation or resale of those distressed assets, and eventually changed CIT's name to Vericrest Financial, Inc. On June 14, 2009, servicing of Plaintiffs mortgage loan was officially taken over by Vericrest Financial, Inc.

491.     On May 14, 2009, MERS, acting as nominee for Wilmington Finance, Inc., assigned said mortgage loan and Note to LSF6 Mercury REO Investments Trust Series 2008-1, a private mortgage backed Trust ultimately owned and controlled by Lone Star Funds.

492.     Said assignment was recorded in the Middlesex South Registry of Deeds on May 27, 2009, in Book 52856, at page 515.

493.     On August 19, 2011, the LSF6 Mercury REO Investments Trust Series 2008-1 assigned Plaintiffs' Mortgage and Note to Vericrest Opportunity Loan Trust 2010 NPL-1. Wells Fargo Delaware Trust Company, N.A. was noted as Trustee of said Trust on said assignment, which was recorded in the Middlesex South Registry of Deeds, on August 25, 2011 in Book 57345, in page 289.

494.     On May 7, 2012, the Vericrest Opportunity Loan Trust 2010 NPL-1assigned Plaintiffs' Mortgage and Note to LSF6 MRA REO Trust (another Lone Star Funds trust, e.g. LSF = Lone Star Funds). US Bank Trust, N.A. is noted as Trustee of said Trust on said assignment, which was recorded in the Middlesex South Registry of Deeds, on August 25, 2011 in Book 59137, in page 249.

495.     On or about November of 2010, Plaintiffs' suffered financial hardship causing them to be unable to make the monthly mortgage loan payments.

496.     On or about August 7, 2012, U.S. Bank Trust, N.A., acting as Trustee for the LSF MRA REO Trust, held an auction to foreclose Plaintiffs' Mortgage secured by said subject property. Said property was purchased by U.S. Bank Trust, N.A., acting as Trustee for the LSF MRA REO Trust.

497.     Plaintiffs allege that Vericrest had in fact taken over their payment obligations, pursuant to Section 8 of the Note Plaintiff gave in return for said mortgage loan, and Vericrest did make all of the payments due thereunder, to the Note Holder, the LSF MRA REO Trust, and as such the Note was not in default at the time foreclosure action was commenced and/or completed.

498.     As such, said foreclosure was illegal and void as no default existed to the Holder of Note and/or Deed of Trust at time of the aforementioned foreclosure actions.

499.     The Plaintiffs' Mortgage provides for a Statutory Power of Sale in the event of a default of the Note. However, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale could not have legally been exercised.

500.     As no default of the Note existed to said, LSF MRA REO Trust, which was the lawful owner of Plaintiffs' Mortgage and Note, the foreclosure and foreclosure proceedings are/were invalid.

501.     The records regarding the direct servicing agreement among the parties and principal and interest payments to the LSF MRA REO Trust, regarding Plaintiffs' mortgage, are in the control of Defendants Vericrest and U.S. Bank Trust, N.A., and this information can readily be obtained through discovery.

502.     The Defendants' violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in attempting the foreclosure actions stated herein, as Plaintiff's Note was not in default, due to Vericrest taking over the obligations of the

Plaintiffs (pursuant to their Note) and paying those obligations to the true holder of Plaintiffs' Note.

503.     The Defendants' owed Plaintiffs a reasonable duty of care to not attempt or complete foreclosure actions against her that were illegal. Defendants instead knowingly exposed Plaintiffs to substantial risk of loss, by illegally threatening them with and completing foreclosure and subsequent eviction actions. As such, said Defendants breached those reasonable duties of care owed to Plaintiffs. Plaintiffs relied on the Defendants' duty of care and such reliance was reasonable.

504.     The Defendants knew of the falsity of the default status of Plaintiffs' Note, yet foreclosed Plaintiffs Mortgage anyway.

505.     The Defendants' negligence directly caused Plaintiffs harm which was reasonably foreseeable.

506.     The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiffs.

507.     As a direct result of the Defendants' violations of law and negligence, Plaintiffs suffered loss of property interest, loss of equity, significant damage to her credit rating, costs associated with legal defense of foreclosure and eviction, and severe and extreme emotional and mental distress.

### Thomas M. Kearney v. BAC Home Loans Servicing, LP, Bank of America, N. A. & Bank of New York Mellon

508.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

509.     Individual and Representative Plaintiff Thomas M. Kearney is a citizen of Massachusetts residing at, and claims to be the rightful owner of 39 Forest Street, Sherborn, MA 01770 which is one of the subject properties referenced herein.

510.     On or about May 3, 2004, Plaintiff was given a mortgage loan of Six Hundred Fifty Thousand and 00/100 ($650,000.00) by Summit Mortgage, LLC. Said mortgage was recorded

on May 10, 2004 in the Middlesex County South Registry of Deeds as Registered Land Document number 1326943.

511.     Said mortgage loan and Note were immediately purchased from Summit Mortgage, LLC by Countrywide Financial, who in turn, on or about June - July 2004, pooled Plaintiff's mortgage loan and Note with a large number of other mortgages and Notes and sold them to the CWMBS, Inc. CHL Mortgage Pass-through Trust 2004-HYB7 (Trust). Bank of New York Mellon was appointed Trustee of said Trust and Countrywide remained servicer of Plaintiff's mortgage loan.

512.     In 2007, Defendant Bank of America commenced negotiations to acquire Countrywide Home Loans, Inc. and Countrywide Financial Corporation (hereinafter referred to as "Countrywide").  By late 2007, Bank of America, N.A. began merging its operations with Countrywide and adopting some of Countrywide's practices.  From and after its acquisition of Countrywide in July 2008 and continuing to the present, both as a successor in interest to Countrywide and as a principal, Bank of America, N.A., by and through its wholly owned subsidiary BAC Home Loans Servicing, LP, became the servicer of Plaintiff's mortgage loan.

513.     On or about June 2010, Plaintiff suffered financial hardship which caused him to be unable to make his mortgage payments.

514.     On or about June 20, 2011, Harmon Law sent Plaintiff a Notice of Intent to Foreclose on behalf of Bank of New York Mellon, acting as Trustee for the CWMBS, Inc. CHL Mortgage Pass-through Trust 2004-HYB7 (Trust).

515.     Plaintiff alleges that the BOA Servicer Defendants had in fact taken over his payment obligations, pursuant to Section 8 of the Note Plaintiff gave in return for said mortgage loan, and the BOA Servicer Defendants did make all of the payments due thereunder, to the Note Holder, the CWMBS, Inc. CHL Mortgage Pass-through Trust 2004-HYB7, as is required of BOA in the pooling and servicing agreement, between BOA and said Trust. As such the Note was not in default at the time foreclosure action was commenced.

516.     As such, said foreclosure attempt was illegal and void as no default existed to the Holder of Note and/or Deed of Trust at time of the aforementioned foreclosure actions.

517.     The Plaintiff's Mortgage provides for a Statutory Power of Sale in the event of a default of the Note. However, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale could not have legally been exercised.

518.     As no default of the Note existed to the CWMBS, Inc. CHL Mortgage Pass-through Trust 2004-HYB7, which was the lawful owner of Plaintiff's Mortgage and Note, the foreclosure and foreclosure proceedings are/were invalid.

519.     The records regarding the pooling and servicing agreement among the parties and principal and interest payments to the CWMBS, Inc. CHL Mortgage Pass-through Trust 2004-HYB7, regarding Plaintiff's mortgage, are in the control of Defendants BOA and Bank of New York Mellon, and this information can readily be obtained through discovery. However, if the terms of the Prospectus of the CWMBS, Inc. CHL Mortgage Pass-through Trust 2004-HYB7 were adhered to, it is clear that no default of Plaintiff's Note existed at time foreclosure action was commenced.

520.     The Defendants' violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in attempting the foreclosure actions stated herein, as Plaintiff's Note was not in default, due to BOA Servicer Defendants taking over the obligations of the Plaintiff (pursuant to his Note) and paying those obligations to the true holder of his Note.

521.     The Defendants' owed Plaintiff a reasonable duty of care to not attempt or complete foreclosure actions against him that were illegal. Defendants instead knowingly exposed Plaintiff to substantial risk of loss, by illegally threatening him with foreclosure. As such, said Defendants breached those reasonable duties of care owed to Plaintiff. Plaintiff relied on the Defendants' duty of care and such reliance was reasonable.

522.     The Defendants knew of the falsity of the default status of Plaintiff's Note, yet attempted to foreclose Plaintiff's mortgage anyway.

523.     The Defendants' negligence directly caused Plaintiff harm which was reasonably foreseeable.

524.     The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiff.

525.     As a direct result of the Defendants' violations of law and negligence, Plaintiff has been threatened with the loss of property interest, loss of equity, significant damage to his credit rating, costs associated with legal defense of foreclosure, and have suffered severe and extreme emotional and mental distress as the result of Defendants' illegal attempts to foreclose his mortgage.

**Scott A. Webster v. Ocwen Loan Servicing, LLC & FHLMC**

526.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

527.     Individual and Representative Plaintiff Scott A. Webster is a citizen of Massachusetts residing at, and claims to be the rightful owner of 43 Hutchings Street, Boston, MA 02121 which is one of the subject properties referenced herein.

528.     On or about July 28, 2006, Plaintiff was granted a mortgage loan of Three Hundred Thousand and 00/100 ($300,000.00) by Taylor Bean & Whitaker Mortgage Corp. Said mortgage was recorded on August 2, 2006 in the Suffolk County Registry of Deeds in Book 40126, at page 233.

529.     On or about September - October 2006, upon information and belief, said mortgage was pooled by Trustee Defendant FHLMC, with a large number of other mortgages and sold to an as yet known and unidentified FHLMC created Trust. Taylor Bean & Whitaker originally retained the servicing rights to Plaintiffs mortgage loan, which were subsequently transferred, or sold to Saxon Mortgage and eventually to Ocwen Loan Servicing, LLC.

530.     Upon information and belief, the servicing of the Mortgage, and the Note given by Plaintiff was, from no later than October 2006, governed by a FHLMC Master Trust Agreement and his mortgage payments were unconditionally guaranteed, by FHLMC, to said Trust, as specified in said Trust Agreement.

96

531.     On or about July 2009, Plaintiff experienced financial hardship which caused him to be unable to make his mortgage payments.

532.     On or about July, 2012, Orlans Moran, PLLC sent Plaintiff notice they had been retained by Defendant Ocwen Loan Servicing, LLC to foreclose Plaintiff's mortgage.

533.     Orlans Moran, PLLC subsequently set foreclosure auction date for Plaintiffs subject property for September 18, 2012, and on said date Plaintiffs mortgage was foreclosed and his property sold by Ocwen acting as nominee for FHLMC, acting in its capacity as Trustee for an as yet accurately identified FHLMC created and sponsored "Pool" (Trust).

534.     As stated in the FHLMC Pass-Through Certificates Master Trust Agreement (Exhibit 14) an asset of a FHLMC created Trust ("Pass-Through Pool") is defined as an asset transferred by the Depositor (FHLMC) to the Trustee (FHLMC) for inclusion in a Pass-Through Pool and backing the related Pass-Through Certificates (MBS).

535.     Furthermore, as stated in the FHLMC Pass-Through Certificates Master Trust Agreement, FHLMC as the Depositor, by delivering any assets pursuant to said Master Trust Agreement, unconditionally, absolutely and irrevocably transfers, assigns, sets over and otherwise conveys to the Trustee (FHLMC) of said Pass-Through Pools (FHLMC created Trusts), on behalf of the related Holders, all of Depositor's (FHLMC) right, title and interest in and to such assets, including all payments of Principal and Interest thereon received.

536.     Defendant FHLMC guarantees to each Trust it creates, Trustee of each Trust (FHLMC) and to each Holder of a Pass-Through Certificate, timely payment of principal and interest. This guarantee is irrespective of the cash flows received from borrowers.

537.     Plaintiff alleges that the Ocwen Servicer Defendant or FHLMC (by virtue of their guarantee) had in fact taken over his payment obligations, pursuant to Section 8 of the Note Plaintiff gave in return for said mortgage loan, and Ocwen or FHLMC did make all of the payments due thereunder, to the Note Holder, to the true owner of Plaintiff's Note and Mortgage, an as yet accurately indentified FHLMC mortgage backed Trust or "Pool", as is stated as being required in the FHLMC Pass-Through Certificates Master Trust Agreement,

evidenced herein, regarding said mortgage backed Trust. As such Plaintiff's Note was not in default at the time foreclosure action was commenced, and/or completed.

538.     As such, said foreclosure action was illegal and void, as no default existed to the Holder of Note and/or Mortgage at time of the aforementioned foreclosure action.

539.     The Plaintiff's Mortgage provides for the Statutory Power of Sale in the event of a default on the Note. However, as the Note is not, nor has it ever been, in default to its Holder, the Statutory Power of Sale cannot be legally exercised

540.     Plaintiff alleges that said foreclosure action was illegal as no default existed to Holder of his Note due to the third party servicer's (Ocwen) and/or Administrator and/or Trustee FHLMC's payment (by virtue of their guarantee) of Plaintiff's mortgage obligation to the Holder of his Note and Mortgage (the as yet identified FHLMC Trust) as required under the FHLMC Master Trust Agreement regarding said mortgage obligation.

541.     As no default of the Note exists to said, as yet unidentified, FHLMC sponsored mortgage backed Trust, which is the lawful owner of Plaintiff's Mortgage and Note, the foreclosure proceedings are invalid.

542.     The records regarding the direct servicing contract among the parties and principal and interest payments to said FHLMC sponsored mortgage backed Trust, regarding Plaintiff's mortgage obligation, are in the control of Defendant FHLMC, and this information can readily be obtained through discovery. However, if the terms of FHLMC's Master Trust Agreement were adhered to, it is clear that no default of Plaintiff's Note now exists or existed at time foreclosure actions were commenced.

543.     The Defendants' violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in attempting the foreclosure actions stated herein, as Plaintiff's Note is not in default, due to the Defendants Ocwen and/or FHLMC taking over the obligations of the Plaintiff (pursuant to their Note) and paying those obligations to the true holder of their Note.

544.     The Defendants' owed Plaintiff a reasonable duty of care to not attempt foreclosure actions against them that are illegal. Defendants instead knowingly exposed Plaintiff to substantial risk of loss, by illegally threatening them with foreclosure. As such, said Defendants breached those reasonable duties of care owed to Plaintiff. Plaintiff relied on the Defendants' duty of care and such reliance was reasonable.

545.     The Defendants knew of the falsity of the default status of Plaintiff's Note, yet proceeded with foreclosure actions against Plaintiff's mortgage anyway.

546.     The Defendants' negligence caused Plaintiff harm which was reasonably foreseeable.

547.     The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiff.

548.     As a direct result of Defendants' violations of law and negligence, Plaintiff is threatened with the loss of his home, equity and property interest, suffered significant damage to his credit rating, significant legal costs in defense of foreclosure and potential eviction, and severe and extreme emotional and mental distress.

**Joseph M. O'Brien v. American Home Mortgage Servicing, Inc.**

**& Wells Fargo Bank, N.A.**

549.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

550.     Individual and Representative Plaintiff Joseph M. O'Brien is a citizen of Massachusetts residing at, and claims to be the rightful owner of 251 Theresa Road, Bellingham, MA 02019.

551.     On or about December 10, 2004, Plaintiff was granted a mortgage loan of Two Hundred Thirty Six Thousand Eight Hundred and 00/100 ($236,800.00) by Mortgage Solutions, Inc. Said mortgage was recorded on December 15, 2004 in the Norfolk County Registry of Deeds in Book 21889, at page 572.

552.     On or about January – February 2005, said mortgage was pooled, with a large number of other mortgages and sold to the Option One Mortgage Loan Trust 2005-2, Asset-Backed Certificates, Series 2005-2 (Trust). Option One Mortgage Corporation (the mortgage

servicer – not the aforementioned Trust) originally retained the servicing rights to Plaintiff's mortgage loan, which were subsequently transferred, or sold in 2009 to American Home Loan Servicing, Inc.

553.     On or about July 2009, Plaintiff experienced financial hardship which caused him to be unable to make his mortgage payments.

554.     On or about July, 2012, Ablitt Scofield sent Plaintiff notice they had been retained by Defendant Wells Fargo Bank, N.A., as Trustee for the Option One Mortgage Loan Trust 2005-2, Asset-Backed Certificates, Series 2005-2, to foreclose Plaintiff's mortgage.

555.     Ablitt Scofield subsequently set foreclosure auction date for Plaintiff's subject property for March 28, 2011, and on said date Plaintiff's mortgage was foreclosed and his property sold.

556.     Plaintiff alleges that the American Home Mortgage Servicing, Inc. Servicer Defendant (AHMSI) had in fact taken over his payment obligations, pursuant to Section 8 of the Note Plaintiff gave in return for said mortgage loan, and the AHMSI Servicer Defendants did make all of the payments due thereunder, to the Note Holder, the Option One Mortgage Loan Trust 2005-2, Asset-Backed Certificates, Series 2005-2, as is stated as being required of AHMSI in the Prospectus Supplement, evidenced herein, regarding said mortgage backed Trust (Exhibit 16 - *Id. at pp. 80 "Advances"*). As such the Note was not in default at the time foreclosure action was commenced.

557.     As such, said foreclosure attempt was illegal and void as no default existed to the Holder of Note and/or Deed of Trust at time of the aforementioned foreclosure actions.

558.     The Plaintiff's Mortgage provides for a Statutory Power of Sale in the event of a default of the Note. However, as the Note was not, nor had it ever been, in default to its Holder, the Statutory Power of Sale could not have legally been exercised.

559.     As no default of the Note existed to the Option One Mortgage Loan Trust 2005-2, Asset-Backed Certificates, Series 2005-2, which was the lawful owner of Plaintiff's Mortgage and Note, the foreclosure and foreclosure proceedings are/were invalid.

560.     The records regarding the pooling and servicing agreement among the parties and principal and interest payments to the Option One Mortgage Loan Trust 2005-2, Asset-Backed Certificates, Series 2005-2, regarding Plaintiff's mortgage, are in the control of Defendants AHMSI and Wells Fargo Bank, N.A., and this information can readily be obtained through discovery. However, if the terms of the Prospectus of the Option One Mortgage Loan Trust 2005-2, Asset-Backed Certificates, Series 2005-2 were adhered to, it is clear that no default of Plaintiff's Note existed at time foreclosure action was commenced.

561.     The Defendants' violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in attempting the foreclosure actions stated herein, as Plaintiff's Note was not in default, due to AHMSI Servicer Defendants taking over the obligations of the Plaintiff (pursuant to his Note) and paying those obligations to the true holder of his Note.

562.     The Defendants' owed Plaintiff a reasonable duty of care to not attempt or complete foreclosure actions against him that were illegal. Defendants instead knowingly exposed Plaintiff to substantial risk of loss, by illegally threatening him with foreclosure. As such, said Defendants breached those reasonable duties of care owed to Plaintiff. Plaintiff relied on the Defendants' duty of care and such reliance was reasonable.

563.     The Defendants knew of the falsity of the default status of Plaintiff's Note, yet attempted to foreclose Plaintiff's mortgage anyway.

564.     The Defendants' negligence directly caused Plaintiff harm which was reasonably foreseeable.

565.     The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiff.

566.     As a direct result of the Defendants' violations of law and negligence, Plaintiff has been threatened with the loss of property interest, loss of equity, significant damage to his credit rating, costs associated with legal defense of foreclosure, and has suffered severe and

extreme emotional and mental distress as the result of Defendants' illegal foreclosure and subsequent illegal eviction attempts.

**C.    CLASS ALLEGATIONS AS TO SERVICER & TRUSTEE DEFENDANTS**

567.    Plaintiffs' repeat and re-allege every allegation above as if set forth herein in full.

568.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

569.    The named Plaintiffs sue on behalf of themselves and all homeowners who were subjected to attempted foreclosure actions, completed foreclosure actions and subsequent eviction actions by the Servicer Defendants, the Trustee Defendants, FNMA, and/or FHLMC whereby the foreclosure actions on the mortgage loans of Plaintiffs and others, was in violation of Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602 and §3-603 as those Notes (joined to said mortgage loans), given by Plaintiffs and others, were not in default, due to the Servicer Defendants, FHLMC, or FNMA taking over the obligations of the Plaintiffs and others (pursuant to those Notes) and paying those obligations to the true holders of those Notes.

570.    Plaintiffs and others were harmed by the Servicer, Trustee, FNMA, and FHLMC Defendants' violation of Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in that they were foreclosed upon illegally, suffered the wrongful loss of property, loss of equity, suffered eviction from their homes, their credit ratings were damaged, incurred legal expenses related to bankruptcy, foreclosure and eviction defense, incurred moving and storage expenses, and were subjected to extreme emotional and mental distress.

571.    Plaintiffs and others have standing to make their claims for violation of Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in that they are parties to contracts, through those Notes, given in exchange for their mortgage loans, to their lender which were subsequently purchased and held by the various Trusts as noted herein.

572.     The Servicer, Trustee, FNMA, and FHLMC Defendants violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603 in that they knowingly took the actions described herein, acting on behalf of those Trusts.

573.     The Servicer, Trustee, FNMA, and FHLMC Defendants were negligent in their duty of care in their actions as stated herein.

574.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA owed Plaintiffs and others reasonable duties of care as the servicers of their mortgage loans, and as Trustees of the Trusts that owned Plaintiffs and others Notes, to not illegally attempt to foreclose, or complete foreclosure on their mortgage loans and subsequently evict them from their rightful property.

575.     Plaintiffs and others relied on the Servicer, Trustee, FNMA, and FHLMC Defendants' reasonable duties of care owed to them to not be subjected to illegal foreclosure actions, and such reliance was reasonable. Plaintiffs and others were instead knowingly exposed to substantial risk of loss, by being illegally threatened with foreclosure, foreclosed upon, and evicted from their rightful property. As such, said Defendants breached those reasonable duties of care owed to Plaintiffs and others.

576.     There exists a close relationship of proximity between Plaintiffs and the Servicer Defendants as the Servicer Defendants service the mortgage loan accounts of the Plaintiffs and others.

577.     There exists a close relationship of proximity between Plaintiffs, the Trustee, FNMA, and FHLMC Defendants, as they act in their capacity as Trustees of the Trusts, which own the Notes and mortgage loans of Plaintiffs and others. Those Trusts are special purpose vehicles, or "Shells", created for the sole purpose of owning those Notes and mortgage loans and as such, the Trustee Defendants, FNMA, and FHLMC are responsible for all actions taken on behalf of said Trusts.

578.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA knowingly, illegally foreclosed the mortgage loans of Plaintiffs and others and it was reasonably

foreseeable that those actions would be the direct cause of the harm suffered by Plaintiffs and others.

579.    The Servicer Defendants, FHLMC, or FNMA knew they had, taken over Plaintiffs and others monthly mortgage obligations, pursuant to their Notes, and made payments to the Trusts that owned Plaintiffs and others Mortgages.

580.    The Trustee Defendants knew that the Servicer Defendants, FHLMC, or FNMA had taken over Plaintiffs and others monthly mortgage obligations, pursuant to their Notes, and made payments to the Trusts that owned Plaintiffs and others mortgage loans.

581.    The Defendants knew of the falsity of the default status of Plaintiffs Note, yet foreclosed Plaintiffs mortgage anyway.

582.    The Defendants' negligence caused Plaintiffs harm which was reasonably foreseeable.

583.    The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiffs.

584.    The Trustee Defendants ignored their reasonable duties of care owed to Plaintiffs and others as Trustees of the Trusts that owned Plaintiffs and others Notes and mortgage loans, to stop, prevent or otherwise ensure that illegal foreclosure and eviction actions were not taken against them.

585.    The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA attempted foreclosure, foreclosed on Plaintiffs and others mortgage loans, and subsequently evicted them from their rightful property, knowing their Notes were not in default, exposing them to significant risk of loss.

586.    Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving, storage and relocation expenses.

587.    Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, extreme mental and emotional distress as the result of being threatened with foreclosure, and eventual loss of their homes.

588.    The Servicer Defendants negligence directly caused Plaintiffs and others harm which was reasonably foreseeable.

589.    Plaintiffs seek punitive damages on behalf of themselves and others so similarly situated.

590.    Plaintiffs claim on behalf of themselves and others so similarly situated that the Servicer Defendants, Trustee Defendants, FNMA, and FHLMS's actions, as stated herein above, were the direct cause of the reasonably foreseeable harm they suffered.

591.    Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, the Defendants' current employees and current or former officers, directors, agents, representatives, their family members, the members of this Court and its staff.

592.    Plaintiffs do not know the exact size or identities of members of the Class, since such information is in the exclusive control of Defendants.  Plaintiffs believe that the Class encompasses tens or hundreds of thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the Class is so numerous that joinder of all members is impracticable.

593.    All members of the Class have been subject to and affected by the same conduct. The claims are based on standard form contracts.

594.    There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

a.      the nature and scope of the Servicer Defendants', FNMA, and FHLMC's delinquency advance payments, made to Trusts, when taking over the obligations, pursuant to the Notes, of Plaintiffs and others;

b.      the nature, scope, and knowledge of the Trustee Defendants', FNMA, and FHLMC's receipt of delinquency advance payments made to Trusts by the Servicer Defendants when taking over the obligations, pursuant to the Notes, of Plaintiffs and others;

c.      whether the Servicer, Trustee, FNMA, and/or FHLMC Defendants' conduct in the circumstances described herein and in the underlying complaints amounts to violation of Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603;

d.      whether the Servicer, Trustee, FNMA, and/or FHLMC Defendants' conduct in the circumstances described herein and in the underlying complaints was negligent;

e.      whether the Court can order damages and enter injunctive relief.

595.    The claims of the Named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the class in that the Named Plaintiffs and the other members of the class were subject to the same conduct.

596.    The named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the class claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

597.    A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

598.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

599.     The Servicer, Trustee, FNMA, and/or FHLMC Defendants' acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

 **D.  CAUSES OF ACTION**

**COUNT III**
**As to the Servicer, Trustee, FHLMC, and FNMA Defendants**
**Violation of Massachusetts Uniform Commercial Code,**
**G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603**

600.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

601.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

602.     As the entities responsible for exercising the statutory power of sale, the Servicer, Trustee, FNMA and FHLMC Defendants owed Plaintiffs and others a duty of good faith and fair dealing in their conduct leading up to the foreclosure proceedings and sale, in ensuring that their actions were in fact legal.

603.     The Servicer, Trustee, FNMA and FHLMC Defendants knew that Servicer, FNMA or FHLMC Defendants had taken over the obligations of Plaintiffs and others Notes, pursuant to Section 8 of those Notes, and paid the monthly mortgage loan obligations of Plaintiffs and others to the true holder in due course of their Notes, and as such Plaintiffs' and others monthly obligations under those Notes were paid.

604.     By conducting foreclosure proceedings when Plaintiffs' and others monthly obligations were paid the Servicer, Trustee, FNMA and FHLMC Defendants violated Massachusetts Uniform Commercial Code, G.L. c. 15, Chap. 106, Art. 3, §3-602  and §3-603.

605.     Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving and relocation expenses.

606.     Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, loss of their homes, and extreme emotional and mental distress.

607.     Plaintiffs are entitled to punitive damages on behalf of themselves and others so similarly situated.

608.     The Plaintiffs and others are entitled to a declaratory judgment determining that the foreclosure proceedings and/or sales of their property are void.

609.     Plaintiffs and others are entitled to an injunction requiring that Defendants' take all necessary steps to restore legal title to their property as if no foreclosure sale had ever occurred.

610.     Plaintiffs and others are entitled to an injunction requiring that the Defendants be prevented from foreclosure action against Plaintiffs and others so similarly situated, or any eviction action until such time as proper notice is made pursuant to statute.

611.     The Plaintiffs and others so similarly situated are entitled to cancellation of costs and fees assessed to their accounts for wrongful foreclosure, together with additional damages.

612.     Defendants conduct was likely to induce reliance and to create confusion and misunderstanding.

613.     Defendants conduct as set forth herein is not required, permitted or authorized by any state or federal law.

614.     Defendants conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

615.     Plaintiffs and others are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

### COUNT IV
**As to the Servicer, Trustee, FHLMC, and FNMA Defendants**
**Negligence**

616.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

617.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

618.     As the entities responsible for exercising the statutory power of sale, the Servicer, Trustee, FNMA and FHLMC Defendants owed Plaintiffs and others reasonable duties of care in their conduct leading up to the foreclosure proceedings and sale to ensure that the actions taken were in fact legal and would not knowingly expose Plaintiffs and others to substantial risk of loss.

619.     The Servicer, Trustee, FNMA and FHLMC Defendants knew that Servicer, FNMA or FHLMC Defendants had taken over the obligations of Plaintiffs and others Notes, pursuant to Section 8 of those Notes, and paid the monthly mortgage loan obligations of Plaintiffs and others to the true holder in due course of their Notes, and as such Plaintiffs' and others monthly obligations under those Notes were paid.

620.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA owed Plaintiffs and others reasonable duties of care as the servicers of their mortgage loans, and as Trustees of the Trusts that owned Plaintiffs and others Notes, to not illegally attempt to foreclose, or complete foreclosure on their mortgage loans and subsequently evict them from their rightful property.

621.     Plaintiffs and others relied on the Servicer, Trustee, FNMA, and FHLMC Defendants' duties of care owed to them and such reliance was reasonable. Plaintiffs and others were instead knowingly exposed to substantial risk of loss, by being negligently and illegally threatened with foreclosure, foreclosed upon, evicted from their rightful property. By doing so, the Servicer, Trustee, FNMA and FHLMC Defendants their duties of reasonable care owed to Plaintiffs and others.

622.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA knowingly negligently, recklessly, and illegally foreclosed the mortgage loans of Plaintiffs and others and

it was reasonably foreseeable that those actions would be the direct cause of the harm suffered by Plaintiffs and others.

623.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA knew they had, taken over Plaintiffs and others monthly mortgage obligations, pursuant to their Notes, and made delinquency advance payments to the Trusts that owned Plaintiffs and others Mortgages.

624.     The Servicer Defendants, Trustee Defendants, FHLMC, or FNMA then foreclosed on Plaintiffs and others, knowing their Notes were not in default, exposing them to significant risk of loss.

625.     The Defendants knew of the falsity of the default status of Plaintiffs Note, yet foreclosed Plaintiffs mortgage anyway.

626.     The Defendants' negligence caused Plaintiffs harm which was reasonably foreseeable.

627.     The Defendants' illegal foreclosure actions and negligence therein were the direct cause of damages suffered by Plaintiffs.

628.     As the direct cause of the Defendants actions as stated herein, Plaintiffs and others suffered quantifiable damages such as loss of equity in their homes, money spent on funding bankruptcy, legal defense of foreclosure and eviction, and moving and relocation expenses.

629.     As the direct cause of the Defendants actions as stated herein, Plaintiffs and others have suffered general damages such as loss of property interest, negative impact to credit ratings, loss of their homes, and extreme emotional distress.

630.     Plaintiffs are entitled to punitive damages on behalf of themselves and others so similarly situated. Defendants conduct as set forth herein is not required, permitted or authorized by any state or federal law.

631.     Defendants conduct as set forth herein violates established public policy, and the harms caused to consumers greatly outweighs any benefits associated with that conduct.

632.     Plaintiffs and others are entitled to actual, statutory and exemplary damages, restitution, an accounting, attorneys' fees and costs, equitable relief and all other relief as provided by state law.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.      WHEREFORE, the Plaintiffs respectfully request the following relief:

a.      Certify this case as a class action and appoint the named Plaintiffs to be class representatives and their counsel to be class counsel;

b.      Enter a judgment declaring the acts and practices of Defendants complained of herein do constitute a fraud, negligence, and violations of state uniform commercial code, together with an award of monetary damages and other available relief on those claims;

c.      Grant a permanent or final injunction enjoining Defendants agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d.      Order specific performance of Defendants obligations together with other relief required by law;

f.      Award actual, exemplary and/or statutory minimum damages;

g.      Award restitution and prejudgment interest;

h.      Award punitive damages;

i.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

j.      Grant Plaintiffs and the Class such other and further relief as this Court finds

necessary and proper.

Dated:  November 15, 2012

Respectfully Submitted,

_____/s/ Todd S. Dion_____ _____
Todd S. Dion, Esq. (BBO #659109)
1319 Cranston Street
Cranston, RI 02920
Telephone: 401-942-9924
Facsimile:  401-942-9925
toddsdion@msn.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2012, a copy of the foregoing document, filed through the CM/ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on the parties listed on the NEF as not receiving electronic notice.

_____/s/ Todd S. Dion__ _ _____ _____
Todd S. Dion, Esq.